Jennifer R. Schwartz, (WSBA #38388)
WILDEARTH GUARDIANS
P.O. Box 13086
Portland, OR 97213
Tel: (503) 780-8281
jschwartz@wildearthguardians.org

Talasi B. Brooks (ISB #9712) (*pro hac vice* application pending)
WESTERN WATERSHEDS PROJECT
P.O. Box 2863
Boise ID 83701
Tel: (208) 336-9077
tbrooks@westernwatersheds.org

Lauren M. Rule, (OSB #015174) (*pro hac vice* application pending)
ADVOCATES FOR THE WEST
3701 SE Milwaukie Ave., Suite B
Portland, OR 97202
Tel: (503) 914-6388
lrule@advocateswest.org

    *Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WASHINGTON


| | |
|---|---|
| WILDEARTH GUARDIANS, WESTERN WATERSHEDS PROJECT, and KETTLE RANGE CONSERVATION GROUP, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. FOREST SERVICE; GLENN CASAMASSA, Pacific Northwest Regional Forester, U.S. Forest Service; RODNEY SMOLDON, Forest Supervisor, ) | Case Number: <br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF <br><br> (National Forest Management Act, National Environmental Policy Act, Endangered Species Act, and Administrative Procedure Act) |

Colville National Forest,                    )

    Defendants.

## INTRODUCTION

1.     The U.S. Forest Service is tasked with responsibly managing public lands livestock grazing so as not to impair the diversity and viability of native wildlife inhabiting our national forests. As the federal land manager, this responsibility means the Forest Service must carefully evaluate whether federal forest lands are suitable for domestic livestock grazing and explore methods for reducing conflicts between wild animal populations and the sheep and cattle it authorizes to graze those lands. Yet, the federal managers of the Colville National Forest in northeast Washington have wholly ignored this responsibility. They have neglected their duty to address grazing conflicts and protect the Forest's newly recolonizing gray wolves, by refusing to adopt management directives that can reduce and avoid wolf-livestock conflicts. First, the Forest Service rejected Plaintiffs' calls for incorporating conflict reduction measures at the Forest-wide scale, in the agency's newly revised Land and Resource Management Plan ("Forest Plan"). Then, the Forest Service rejected calls to update individual (site-specific) Allotment Management Plans and annual grazing instructions, to incorporate conflict reduction measures for those portions of the Colville National Forest where wolf-livestock conflicts have concentrated for the past several years.

COMPLAINT                                                      2

Instead, since 2012, the Forest Service has reissued status quo grazing practices and sat idly by while the Washington Department of Fish and Wildlife ("WDFW") killed 26 state-listed endangered wolves at the behest of one ranching corporation—Diamond M Ranch ("Diamond M") —which grazes its cattle on rugged, heavily-treed portions of the National Forest.

2.    Indeed, roughly 90% of the state's "lethal control actions" have responded to conflicts between wolves and cattle grazing on the Colville National Forest (the "Colville"). And, 26 of 31 gray wolves killed by WDFW to date – 84% – have been lethally removed from this National Forest in response to depredations of Diamond M's cows and calves. Unlike other nearby ranchers, Diamond M steadfastly refuses to employ commonsense measures that help avoid conflicts with wolves. But despite this grisly record, the Forest Service continues authorizing Diamond M's grazing without imposing any measures to mitigate wolf-livestock conflicts and ensure this native carnivore's preservation on the Colville. In so doing, the Forest Service has abdicated its management responsibilities, violating the National Forest Management Act (NFMA), National Environmental Policy Act (NEPA), and Administrative Procedure Act (APA).

3.    The 1.1-million-acre Colville National Forest, geographically considered part of the northern Rocky Mountains, with the Kettle River Range on the western half and the Selkirk Mountains defining the eastern half, is mostly

COMPLAINT                                                                                          3

comprised of densely forested, rugged terrain: prime habitat for native carnivores like wolves, grizzly bear, and lynx. But the Colville is also widely grazed by cattle. The Forest Service administers approximately 68% of this National Forest (about 745,000 acres) as livestock grazing "allotments." Still, the agency refuses to evaluate or adopt management tools for avoiding livestock-predator conflicts on the Colville, both at the Forest-wide scale, in its newly revised comprehensive Forest Plan, and at the allotment-specific level in Allotment Management Plans ("AMPs") and annual grazing authorizations for permittees like Diamond M.

4.     Accordingly, Plaintiffs challenge the Forest Service's revised 2019 Colville Forest Plan and underlying environmental analysis, for failing to evaluate the impacts of domestic livestock grazing to newly recolonizing gray wolves, for failing to consider a single management alternative that includes measures for reducing wolf-livestock conflicts on the Colville, and for failing to consider whether all 68% of the National Forest that is allocated for domestic livestock grazing remains suitable for this use in light of the recurring conflicts. The Forest Service's procedural failures resulted in a substantively flawed Forest Plan, violating both NEPA, NFMA, and those statutes' implementing regulations.

5.     The Forest Service also violated NEPA by failing to supplement forty-plus year-old environmental analyses for livestock grazing management at the site-specific level for allotments permitted to Diamond M Ranch, in light of wolves

COMPLAINT                                                                                     4

reclaiming their historic habitat in the Kettle River Range and after years of high-profile conflicts with Diamond M's cattle ensued.

6.      In addition, to the best of Plaintiffs' knowledge, the Forest Service's 2020 annual grazing instructions for Diamond M lack measures for reducing wolf-livestock conflicts. This renders the 2020 grazing authorizations for Diamond M inconsistent with new Forest Plan direction intended to reduce risk factors to Forest Service designated "sensitive species" like the gray wolf and ensure the wolf's viability on the Colville National Forest, violating NFMA.

7.      Last, Plaintiffs also challenge the Forest Service's failure under the Endangered Species Act (ESA) to prepare a Biological Assessment (BA) and consult the U.S. Fish & Wildlife Service (USFWS) over the impacts of Diamond M's cattle grazing to federally protected species like Canada lynx and grizzly bear, which are both listed as "threatened."

8.      To protect wolves and other imperiled wildlife from the unexamined harms threatened by ongoing livestock grazing allowed under the revised Colville Forest Plan and allotment-specific grazing authorizations for Diamond M Ranch, Plaintiffs now turn to this Court for relief.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701-706 (APA); 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory relief),

COMPLAINT                                                                    5

2412 (costs and fees) and 1346 (United States as a defendant). This cause of action arises under the laws of the United States, including the APA, 5 U.S.C. § 701 *et seq.*, NEPA, 42 U.S.C. § 4321 *et seq.*, NFMA, 16 U.S.C. § 1600 *et seq.*, the ESA, 16 U.S.C. § 1536, and these statutes' implementing regulations. An actual, justiciable controversy exists between the parties, and the requested relief is therefore proper under 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

10.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

11.     The federal government waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

12.     Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and the health of the American West. Guardians has more than 275,000 members and supporters across the West, including those who reside in Washington and visit the Colville National Forest. Guardians maintains offices in several states, including Portland, Oregon; Seattle, Washington; Missoula, Montana; Denver, Colorado; and Santa Fe, New Mexico. Guardians has a long history of working to protect and restore native wildlife species across the West,

including gray wolves, grizzly bears, and Canada lynx. Guardians operates a wildlife program with campaigns focused on native carnivore protection and restoration, and on reining in the controversial, cruel, and often counterproductive practices of killing native predators on behalf of the livestock industry and in response to irresponsible grazing practices on federal public lands.

13.     Plaintiff WESTERN WATERSHEDS PROJECT ("WWP") is a nonprofit membership organization with over 12,000 members and supporters, which is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP, as an organization and on behalf of its members, is concerned with and active in seeking to protect and improve the wildlife, riparian areas, water quality, fisheries, and other natural resources and ecological values of watersheds throughout the West, and in Washington. WWP has a longstanding interest in the management of livestock grazing on the Colville National Forest, and in ensuring that any such grazing is ecologically sustainable and requires peaceful coexistence with all species of native wildlife, including the gray wolf.

14.     Plaintiff KETTLE RANGE CONSERVATION GROUP ("KRCG") is a rural, grassroots, federal non-profit environmental charity formed in 1976 in Republic, Washington, with a membership of 500. KRCG is focused on a mission to defend wilderness, protect biodiversity, and restore ecosystems of the upper

COMPLAINT                                                                           7

Columbia River Basin. KRCG project work includes oversight of federal management of the Okanogan and Colville National Forests, promoting dry and damaged forest restoration, environmental education to citizens, business and community groups, granting scholarships to high school graduates each May, preservation of Wilderness and protecting fish and wildlife. KRCG is a founding member of the board of Northeast Washington Forest Coalition, a collaborative partnership created in 2003 between timber industry, forest and wildlife conservation and recreation interests.

15.    Defendant FOREST SERVICE is an agency of the United States within the Department of Agriculture, and is charged with managing the public lands and wildlife of the Colville National Forest, in accordance and compliance with NEPA, NFMA, the ESA and their implementing regulations.

16.    Defendant GLENN CASAMASSA is the Pacific Northwest Regional Forester for the U.S. Forest Service. He is sued solely in his official capacity as the decisionmaker who signed the final Record of Decision for the 2019 Colville Forest Plan challenged herein.

17.    Defendant RODNEY SMOLDON is the Forest Supervisor for the Colville National Forest. In that capacity, Defendant Smoldon is responsible for the management of the Colville National Forest and its compliance with NEPA,

COMPLAINT                                                                                  8

NFMA and ESA requirements. Defendant Smoldon is sued solely in his official capacity.

18.    Defendants are collectively referred to as the "Forest Service."

19.    Plaintiffs bring this action on their own behalf and on behalf of their members and supporters, many of whom live in or near areas occupied by wolves in parts of Washington where the wolf has lost protection under the federal Endangered Species Act, including the Colville National Forest, or visit these areas occupied by wolves for hiking, camping, photography, observing wildlife and studying the ecological role of top predators in native ecosystems, and other recreational and professional pursuits. Plaintiffs' members, supporters, and staff gain aesthetic enjoyment from observing, attempting to observe, hearing, seeing evidence of, and studying wild wolves, grizzly bears and lynx, including observing signs of these species' presence in the Colville National Forest and surrounding areas and observing ecosystems enhanced by these animals. The opportunity to possibly view wolves, grizzly bear, and lynx, or signs of these animals, in these areas is of significant interest and value to Plaintiffs' members, supporters, and staff, and increases their use and enjoyment of public lands. Plaintiffs' members, supporters, and staff have engaged in these activities in the past, and intend to do so again in the near future. Plaintiffs, as well as their members, supporters, and staff, are dedicated to ensuring the long-term survival and recovery of the gray

COMPLAINT                                                                                        9

wolf, grizzly bear, and lynx throughout the contiguous United States, and specifically in the Pacific Northwest. The legal violations alleged in this Complaint therefore cause direct injury to the aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of Plaintiffs and their members, supporters, and staff.

20.     Plaintiffs' members, supporters, and staff have an interest in ensuring the Forest Service complies with all applicable federal statutes and regulations in authorizing domestic livestock grazing on federal forest lands. Plaintiffs' members, supporters, and staff have an interest in ensuring that the Forest Service fulfills its obligation to manage the Colville National Forest in a manner that does not impair the diversity and viability of native wildlife, particularly already vulnerable populations of state-listed endangered gray wolves (also a designated Forest Service "sensitive" species), which inhabit these National Forest lands. Plaintiffs and their members, supporters, and staff have an interest in ensuring the Forest Service takes the requisite hard look at modifying grazing management in order to mitigate recurring wolf-livestock conflicts that result in the lethal removal of wolves from the Colville National Forest. The interests of Plaintiffs, their members, supporters, and staff have been, are being, and, unless the relief prayed for in this Complaint is granted, will continue to be adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual,

COMPLAINT                                                                          10

concrete injuries, traceable to Defendants' conduct, that would be redressed by the requested relief.

## LEGAL BACKGROUND

### National Forest Management Act and Livestock Grazing

21. The National Forest Management Act ("NFMA"), 16 U.S.C. §1600-1614, is the primary statute governing the administration of national forests.

22. NFMA establishes a two-step process for forest planning. *Id*. § 1604(a). First, it requires the Forest Service to develop, maintain, and revise Land and Resource Management Plans ("Forest Plans") for each national forest. 16 U.S.C. § 1604(a). The Forest Plan guides natural resource management activities forest-wide, setting standards, management goals and objectives, desired conditions and monitoring and evaluation requirements.

23. NFMA also requires that the Forest Service adopt regulations specifying guidelines for Forest Plans. *Id.* § 1604(g)(3); *see* 36 C.F.R. § 219 *et seq.* Those guidelines must specifically ensure that Forest Plans "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives…." 16 U.S.C. §1604(g)(3)(B).

24. Here, the governing Forest Plan is the Forest Service's revised 2019 Colville Forest Plan, which the agency adopted on October 21, 2019, to replace its

COMPLAINT                                                                                      11

former 1988 Forest Plan. The 2019 Colville Forest Plan was revised under the transition provisions of the 2012 NFMA planning rule (36 C.F.R. § 219), which allows the agency to follow and adopt the 1982 NFMA planning procedures (*see* C.F.R. parts 200 to 299, Revised as of July 1, 2000). The Forest Service elected to apply the 1982 NFMA planning provisions in nearly all respects for the 2019 Colville Forest Plan.[1]

25.     The 1982 planning rule contains both a general wildlife diversity provision and also a specific mandate to ensure viable wildlife populations at the forest scale. The Forest Service's "duty to ensure viable populations 'applies with special force to sensitive species'" like gray wolves on the Colville. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2006) (internal citation omitted); Forest Service Manual (FSM), Ch. 2670 (Forest Service policy for "sensitive species").[2]

---

[1] The only noted exception being that the Forest Service developed the revised Plan's monitoring requirements per 36 C.F.R. § 219.12 of the 2012 Rule.

[2] Forest Service policy defines "sensitive" species as those plant and animal species identified by a Regional Forester for which population viability is a concern, as evidenced by significant current or predicted downward trends in population numbers or density and habitat capability that would reduce a species'

COMPLAINT                                                                12

26.     The rule's diversity mandate has both procedural and substantive elements. Substantively, the Forest Service must ensure its Forest Plans provide for "diversity of plant and animal communities…consistent with the overall multiple-use objectives of the planning area." 36 C.F.R. § 219.26 (1982). Procedurally, to ensure such diversity is adequately "considered throughout the planning process[,]" the Forest Service evaluates wildlife diversity, in terms of prior and present conditions, based on inventories that include "quantitative data." *Id*. For each planning alternative, the Forest Service's planning team must consider how diversity will be affected by the proposed management practices. *Id*.

27.     The 1982 rule's population viability mandate requires the Forest Service to adopt management direction that ensures fish and wildlife habitat will be managed "to maintain viable[3] populations of existing native and desired non-native vertebrate species in the planning area [*i.e.* throughout the relevant national forest]." 36 C.F.R. § 219.19; *see also Idaho Sporting Congress, Inc. v. Rittenhouse*,

---

existing distribution. FSM, Ch. 2670. In addition to being a state-listed endangered species, the gray wolf is also a Forest Service, Region 6 sensitive species.

[3] A viable population is one that has the estimated numbers and distribution of reproductive individuals to ensure its continued existence is well distributed in the national forest ("the planning area") (36 C.F.R. § 219.19).

COMPLAINT                                                                                      13

305 F.3d 957 (9th Cir. 2002).

28.     The 1982 rule also instructs the Forest Service to determine the capability and suitability of National Forest System lands for domestic livestock grazing during the forest planning process. 36 C.F.R. § 219.20. Capability refers to the potential of an area of land to produce particular resources, such as forage to support the needs of both native wildlife and domestic livestock, which in turn depends on the physical components of the area such as climate, slope, landform, soils, and geology, as well as the application of management practices. *Id*. at § 219.3. Suitability, on the other hand, is the *appropriateness* of applying certain management practices to a particular portion of the forest, "as determined by an analysis of the economic and environmental consequences and the alternative uses forgone." *Id*. In determining the suitability of lands for grazing, the Forest Service must expressly consider possible conflict among livestock and the forest's wild animal populations, and methods of regulating such conflicts. *See id*. § 219.20. This forest-wide grazing suitability determination then informs management direction at the allotment-specific level.

29.     Once a Forest Plan is adopted, the Forest Service implements the plan by approving or rejecting site-specific actions for the National Forest System lands

that it governs, including authorizing livestock grazing on specific areas designated as "allotments."[4]

30.    The NFMA and its implementing regulations require that all site-specific actions be consistent with the governing Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15 (2012). A project or activity is consistent if it conforms to the applicable "components" of the Forest Plan, including the standards, guidelines, and desired conditions that are set forth in the Forest Plan and that collectively establish the details of forest management. *Id*. § 219.15 (2012); *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).

31.    The Forest Service manages livestock grazing on an allotment by issuing a grazing permit; an Allotment Management Plan (AMP); and an annual operating plan (AOP) or instruction (AOI). *Or. Natural Desert Ass'n ("ONDA") v. U.S. Forest Serv.,* 465 F.3d 977, 979 (9th Cir. 2006). Each of these is a site-specific action which must be consistent with the Forest Plan. *Buckingham v. Sec'y of U.S. Dept. of Ag.,* 603 F.3d 1073, 1077 (9th Cir. 2010).

32.    A grazing permit grants a license and establishes the number, kind, and class of livestock; the allotment to be grazed; and the period of authorized use. *ONDA,* 465 F.3d at 980 (citing 36 C.F.R. §§ 222.1–222.4; 43 U.S.C. § 1752).

---

[4] A "designated area of land available for livestock grazing," within a national forest is called an allotment. 36 C.F.R. Ch. II, Part 222; 36 C.F.R. § 222.1(b)(1).

COMPLAINT                                                                                  15

A grazing permit is ordinarily issued for a term of ten years, and may be canceled, modified, or suspended (in whole or in part) under certain conditions, which include changes in resource conditions present on an allotment (*e.g.* new sensitive species) and the need to impose resource protection measures. *Id.*

33.    An AMP is a required allotment-specific planning document that: (1) prescribes the manner in, and extent to which, grazing operations will be conducted in order to meet multiple-use and other goals and objectives, including the protection of special resources occurring on the allotment; (2) describes any range improvements in place or to be installed and maintained to meet allotment objectives; and (3) contains any other grazing management provisions and objectives prescribed by the Forest Service. 36 C.F.R. §§ 222.1(b)(2), 222.2; *see also ONDA v. U.S. Forest Serv.,* 312 F.Supp.2d 1337, 1340 (D. Or. 2004). AMPs are to be updated as needed and must be consistent with the governing Forest Plan. 36 C.F.R. § 222.2.

34.    An AOP or AOI is issued annually prior to the grazing season and sets out instructions to the permittee for that season's grazing operations. Because an AOI is issued annually, it is meant to respond to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit. For instance, an AOI may provide new site-specific management direction in light of changed circumstances or resource conditions on the allotment in any

COMPLAINT                                                                                    16

given year, such as disturbance from wildfire, drought conditions, success or

failure of habitat restoration projects, water quality, or degree of risk to sensitive or

listed species affected by grazing. *See ONDA,* 465 F.3d at 980–81. As the

environmental analysis for the revised Colville Forest Plan states: "Annual

operating instructions for livestock grazing permittees should ensure livestock

numbers are balanced with capacity and address any relevant resource concerns

(e.g., forage production, wildlife, weeds, soils, etc.)."

### National Environmental Policy Act and Livestock Grazing

35.    NEPA "is our basic national charter for protection of the

environment." 40 C.F.R. § 1500.1(a). NEPA has two fundamental purposes: (1) to

guarantee that agencies take a "hard look" at the consequences of their actions

before the actions occur by ensuring that "the agency, in reaching its decision, will

have available, and will carefully consider, detailed information concerning

significant environmental impacts"; and (2) to ensure that "the relevant

information will be made available to the larger audience that may also play a role

in both the decisionmaking process and the implementation of that decision."

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). "NEPA

emphasizes the importance of coherent and comprehensive up-front environmental

analysis to ensure informed decision making to the end that 'the agency will not

act on incomplete information, only to regret its decision after it is too late to

COMPLAINT                                                                                    17

correct.'" *Blue Mtns. Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1216 (9th Cir. 1998) (citation omitted).

36.     To that end, NEPA requires federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for all major federal actions that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C).

37.     If an action does not fall within a categorical exclusion (CE), 40 C.F.R. § 1508.4, an agency may prepare an Environmental Assessment (EA) to determine whether it needs to prepare an EIS. 40 C.F.R. §§ 1501.4(b); 1508.9. An EA is a concise public document that briefly describes the proposal, examines alternatives, considers environmental impacts, and provides a list of individuals and agencies consulted. 40 C.F.R. § 1508.9. If the agency concludes there is no significant impact associated with the proposed project or activity, it may issue a Finding of No Significant Impact (FONSI) in lieu of preparing an EIS. 40 C.F.R. § 1508.9(a)(1).

38.     NEPA analyses must consider a range of reasonable alternative actions and thoroughly assess direct, indirect, and cumulative environmental effects of the proposed alternative actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Parts 1502 and 1508.

39.     An agency's duties do not end upon completing a NEPA analysis, however; agencies also must prepare a supplemental NEPA analysis when

COMPLAINT                                                                                    18

"significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(c)(1)(ii).

40.    The Forest Service uses the NEPA planning process at both broad, programmatic-levels (*e.g.* the development of Forest Plans), and at the individual project or "site-specific" level (*e.g.* the development and approval of grazing AMPs).

41.    Agency actions taken pursuant to NMFA and NEPA are reviewable by this Court under the Administrative Procedure Act. 5 U.S.C. §§ 702, 704, 706.

## Endangered Species Act

42.    The intent of the ESA is to conserve ecosystems upon which threatened and endangered species depend, and recover listed species to the point at which they no longer need the protections of the Act. 16 U.S.C. §§ 1531(b); 1532(3).

43.    A federal agency that authorizes an activity that may affect a listed species or federally designated critical habitat must consult with the USFWS over the impacts of that activity to ensure that it does not jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2). Jeopardize means to reduce appreciably the

COMPLAINT                                                                                          19

likelihood of both the survival and recovery of the species in the wild by reducing the reproduction, numbers, or distribution of the species. 50 C.F.R. § 402.02.

44.    During the ESA consultation process, if the action agency concludes in a "Biological Assessment" that the activity is not likely to adversely affect listed species or adversely modify critical habitat, and the USFWS concurs with that conclusion in a "Letter of Concurrence," then the consultation is complete. *Id.* §§ 402.12, 402.14(b). If, however, the action agency or USFWS determines that the activity is likely to adversely affect listed species or critical habitat, then USFWS completes a "Biological Opinion" to determine whether the activity will jeopardize the species or result in destruction or adverse modification of critical habitat. *Id.* § 402.14.

45.    The ESA and its regulations also prohibit "take" of listed species, which includes harassing, harming, wounding, or killing the species. 16 U.S.C. §§ 1538; 1533(d); 1532(19).

46.    Once the consultation process is complete, the agencies have a duty to ensure that it remains valid. For instance, the Forest Service must reinitiate consultation with USFWS if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered" or "a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16.

COMPLAINT                                                                                        20

## FACTUAL BACKGROUND

### Gray Wolves Return to Washington

47.     A robust population of wolves, numbering as many as 5,000, once ranged throughout nearly all of Washington, but a government-supported policy of eradication led to the near-extirpation of wolves from the state by the early 1900s.

48.     By the time the ESA passed in 1973, there were very few wolves remaining in the lower 48 states. The gray wolf was one of the first species to be listed as endangered under the Act. This action extended federal protections to the few wolves then remaining in the contiguous United States.

49.     Consequently, in 1980, when the gray wolf was added to Washington's state list of endangered species, there were few reports of wolf sign in the state and no evidence of a resident population of breeding wolves.

50.     In 1995-96, USFWS reintroduced wolves to Yellowstone National Park and central Idaho as part of an effort to recover the species. This Northern Rockies wolf population soon began to increase in size and expand in territory. It also became a source population for wolves dispersing westward into Washington in the early 2000s.

51.     In 2008, the state's first two wolf packs since the 1930s were confirmed. One pair, named the Diamond Pack, was first documented in 2008 in Pend Oreille County and confirmed to have pups the following two years. A

COMPLAINT                                                                                      21

second pair, the Lookout Pack, was confirmed in Okanogan County, with litters documented in 2008 and 2009.

52.    By the end of 2019, WDFW counted 108 wolves in 21 packs of which 10 were successful breeding pairs.[5]

53.    Most of Washington's gray wolf population growth has occurred in the northeast corner of the state, encompassing the Colville National Forest, and is composed of wolves dispersing westward from the Northern Rockies and southward from British Columbia, Canada.

### Wolf Conservation and Management in Washington

54.    The USFWS first proposed to delist the Northern Rockies wolf population in 2007, claiming it had met minimum recovery goals of 10 breeding pairs in each of three recovery areas for three consecutive years by the early 2000s.

55.    After federal courts found unlawful and set aside this and subsequent decisions to delist the Northern Rockies wolf population, Congress legislatively

---

[5] WDFW explains that a "successful breeding pair" is used as the unit of measurement because it provides a higher level of certainty in assessing population status and documenting reproduction. Under its state wolf recovery plan, WDFW defines a successful breeding pair of wolves as an adult male and an adult female with at least two pups surviving to December 31 in a given year. The Confederated Tribes of the Colville Reservation, which borders the Colville National Forest to the south, also reported an estimated 37 wolves on tribal lands in 2019.

COMPLAINT                                                                 22

delisted this segment of the country's gray wolf population through a 2011

Appropriations Act rider. This federally delisted Northern Rockies wolf population

(defined by USFWS as a "distinct population segment") included wolves in the

eastern one-third of Oregon and Washington states. Thus, gray wolves remain a

federally-listed endangered species in the western two-thirds of Washington and a

state-listed endangered species throughout the state.[6]



Figure 2. *Washington Gray Wolf Conservation and Management 2019 Annual Report*. (WDFW).

---

[6] Washington law defines "Endangered" as any wildlife species native to the state of Washington that is seriously threatened with extinction throughout all or a significant portion of its range within the state. WAC 232-12-297. On March 15, 2019, the USFWS published a proposed rule to remove the gray wolf from the list of endangered and threatened species. 84 Fed. Reg. 9,451, 9,648 (Mar. 15, 2019). If the rule is finalized as proposed (and not invalidated by a legal challenge) the effect would be to remove the gray wolf from under the federal ESA's protection throughout the contiguous U.S., including all of Washington State.

COMPLAINT                                                                                      23

56.     Under state law, once a species is listed as endangered, WDFW is required to write a species recovery plan with target population objectives, an implementation plan to reach those objectives, and criteria for delisting, education, and monitoring. WAC 220-610-110 §11.1.

57.     Accordingly, in 2007, WDFW began developing a Wolf Conservation and Management Plan, which the state agency adopted in 2011. Wolf populations in the eastern one-third of the state where the species is no longer federally listed are managed under the auspices of the 2011 Wolf Conservation and Management Plan ("WA wolf plan").

58.     The WA wolf plan is "the state recovery plan" for gray wolves. Its purpose is to "ensure the reestablishment of a self-sustaining population of gray wolves in Washington and to encourage social tolerance for the species by addressing and reducing conflicts."

59.     To promote wolf recovery in Washington, the plan provides that "[n]on-lethal management will be emphasized while the species is recovering" and that lethal control will be used to address conflicts only as a "last resort."

60.     Nevertheless, WDFW has killed 31 wolves from eight packs, resulting in the near or total destruction of four packs since 2012. These lethal control actions eliminated up to 11% of the state's wolf population each year in the years in which they occurred.

COMPLAINT                                                                                      24

61.     Though WDFW's wolf kill orders have faced intense legal scrutiny, with some litigation in state court still pending, it is the Forest Service that authorizes the livestock grazing on federal public lands that has been the root cause of 90% of Washington's wolf-livestock conflicts. Of WDFW's 31 lethal control actions, 28 (90%) were either completely or partially in response to predations of federally permitted cattle grazing on the Colville National Forest, with 26 (84%) wolves being killed on behalf of a single permittee—Diamond M.

**The Colville National Forest and Livestock Grazing**

62.     The Colville National Forest spans Ferry, Stevens, and Pend Oreille Counties in northeast Washington; bordered to the north by British Columbia, Canada, to the west by the Okanogan-Wenatchee National Forest, to the east by the Idaho Panhandle National Forests, and to the south by a portion of the Confederated Tribes of the Colville Reservation.[7]

63.     A diverse array of fish, wildlife and plants inhabit the Colville, including many state and federally listed threatened and endangered species and species designated by the Forest Service as "sensitive" because their regional viability is a concern. These include federally endangered woodland caribou; federally threatened Canada lynx, grizzly bear, and bull trout; wolverine and

---

[7] In 2018, the Confederated Tribes of the Colville established a hunting season for wolves on their tribal lands, for tribal members only, with no annual limits.

whitebark pine (candidates for federal listing); and gray wolves (both a state-listed endangered species and Region 6 "sensitive species").

64.    The Colville is mostly forested, but has nevertheless been widely grazed. Relatively large numbers of sheep and cattle grazed the Colville during the 1920-1940s, with cattle utilizing the lower elevations and sheep grazing the higher elevations, especially in the Kettle Crest mountain range. During the 1950s, the majority of sheep grazing ceased on the Forest. Today almost all permitted grazing is for cattle with only one sheep allotment, which is currently vacant, remaining.

65.    Grazing allotments on the Colville cover about 745,000 acres (68%) of administered Forest lands. There are 58 grazing allotments in total, where 42 currently have permitted use and 16 are in vacant status.

66.    In addition to being the source of conflicts with native predators like wolves, bears, and cougars, livestock grazing can dramatically alter native ecological communities, harming both upland and riparian habitat for a multitude of wildlife, fish and plants by degrading vegetation, soils, and streams.

### The Colville's Forest Plan Revision

67.    Until 2019, the Forest Service managed the Colville under a Forest Plan from 1988. In 2004, the agency began the public scoping process for revising this outdated document. Over a decade later, in January 2016, the Forest Service released a draft programmatic EIS for the proposed revised Colville Forest Plan,

COMPLAINT                                                                                           26

which evaluated six alternatives (no action, proposed action, and alternatives P, R, B, and O) for the future Forest-wide management of the Colville.

68.     Plaintiffs submitted detailed comments on the draft EIS for the revised Forest Plan, calling upon the Forest Service to take a hard look at how proposed Forest management for activities like livestock grazing affect newly recolonizing gray wolves and other vulnerable wildlife that inhabit the Colville.

69.     In September 2018, the Forest Service released its final EIS (FEIS) and draft Record of Decision (ROD) for the revised Colville Forest Plan.

70.     Despite purporting to follow the wildlife diversity and viability provisions of the 1982 NFMA planning rule, and despite the highly controversial and well documented pattern of wolf-livestock conflicts on the Colville's grazing allotments, the FEIS did not take the legally required hard look at how wildlife diversity and wolf population viability on the Colville may be influenced by conflicts between wolves and livestock that typically result in lethal wolf removal. The FEIS did not assess the present viability of gray wolves on the Colville or how continued livestock grazing under the planning alternatives may affect this sensitive species' future viability on the National Forest. Nor did the Forest Service, in evaluating the suitability of Forest lands for domestic livestock grazing as the 1982 NFMA rule requires, consider possible conflicts between livestock and

COMPLAINT                                                                                    27

wolves and examine any planning alternatives that incorporate methods for "regulating" such conflicts.

71.     Pursuant to the Forest Service's administrative review process (also referred to as the "objection" process described in 36 CFR 219 Subpart B of the 2012 NFMA planning rule), Plaintiffs filed objections to the FEIS and draft ROD for the revised Forest Plan.

72.     In a jointly submitted objection, Western Watersheds Project and Kettle Range Conservation Group highlighted the Forest Service's failure to disclose and analyze the risks posed to wolves from federally permitted livestock grazing and the need to modify grazing management in order to reduce wolf-livestock conflicts on the Colville National Forest.

73.     For instance, both USFWS and WDFW experts have recommended the following science-backed measures for reducing wolf-livestock conflicts that the Forest Service could have adopted as Forest-wide grazing management direction:

- Removing livestock carcasses on the allotments if they would attract wolves to a potential conflict situation with other grazing livestock;
- Removing sick or injured livestock from the allotments, so they are not targeted by wolves;
- Delaying turnout until after early to mid-June if an active wolf den site is within 1 mile of an allotment unit, so deer will be birthing fawns and can provide an abundant and easy prey source for wolves;
- If an active wolf den site is within or adjacent to an allotment, delay turnout of calves in the area until after they average 200 pounds in weight to minimize depredation potential;

COMPLAINT                                                                                          28

- Prohibit allotment management activities by humans near active wolf den sites during the denning period, to avoid human disturbance of the site;
- Prohibit placing salt or other livestock attractants near wolf dens or rendezvous sites, to minimize cattle use of these sites;
- In the event of depredation, consider moving livestock to another unit or another allotment;
- During times that livestock are in a unit with an active wolf den site or rendezvous site, require the permittee to inspect that unit at least 2 days/week;
- Manage grazing livestock near the core areas (dens, rendezvous sites) of wolf territories to minimize wolf-livestock interactions, such as by placing watering sites, mineral blocks, and supplemental feed away from wolf core areas;
- Temporarily switch grazing sites and move livestock to another location away from core areas;
- Increase the frequency of human presence by using range riders and guard animals and frequently check livestock in areas with wolves or when wolves are in the vicinity of livestock pastures.[8]

74.    In fact, "range management" standards and guidelines in the prior 1988 Colville Forest Plan expressly directed the Forest Service, in developing allotment-specific management plans (AMPs), to give special consideration to: (1) protecting any threatened, endangered or sensitive species present in the area and

---

[8] U.S. Dept. Fish & Wildlife and U.S. Forest Serv., Potential Conservation Measures to Reduce Effects of the Grazing Allotments to Gray Wolves (working draft); Wash. Dept. of Fish and Wildlife, Staff Guidelines: Livestock-Wolf Mitigation Measures; Wash. Dept. of Fish and Wildlife and Western Wildlife Outreach, Living with Livestock and Wolves: A Practical Guide to Avoiding Conflicts Through Non-lethal Means, (2014).

COMPLAINT                                                                                                29

(2) mitigating livestock-wildlife conflicts. The Forest Service abandoned this explicit direction in the revised 2019 Plan.

75. Also, as Plaintiffs noted in their objection, the Forest Service recently proposed incorporating wolf-livestock conflict reduction measures, similar to some of the measures listed in paragraph 73, in its revised Forest Plans for other National Forests in eastern Oregon.[9] For example, the Forest Service proposed the following management standards in the revised Forest Plans for the Wallowa-Whitman, Umatilla, and Malheur National Forests:

- Management activities within one mile of a known active (during same calendar year that use is documented) wolf den and rendezvous sites should implement appropriate seasonal restrictions based on site specific consideration and potential activity effects, to reduce disturbance to denning wolves.
- Do not authorize turnout of sick or injured livestock to reduce risk of attracting wolves.
- Remove or otherwise dispose of livestock carcasses such that the carcass will not attract wolves. If, due to location of the carcass, this is not possible, develop other remedies.
- Do not authorize salt or other livestock attractants near known active (during same calendar year that use is documented) wolf dens or rendezvous sites to minimize livestock use of these sites.

76. Yet the Forest Service never publicly evaluated incorporating such wolf-livestock conflict reduction measures into management direction for the

---

[9] Wolves in Oregon and Washington have followed similar trajectories over the last decade, dispersing westward from neighboring states in the Northern Rockies and first recolonizing historic habitat in the northeastern portions of these states.

COMPLAINT                                                                                    30

revised Colville Forest Plan under any alternative the agency considered in its programmatic EIS.

77.    In October 2019, without resolving Plaintiffs' objection with respect to modifying grazing management to reduce wolf-livestock conflicts on the Colville, or even acknowledging the issue of how livestock grazing affects wolves on this National Forest, the Forest Service signed its final ROD adopting the management directives described in the FEIS under alternative P as the new governing Colville Forest Plan for at least the next fifteen years—or, if prior precedent is any guide, for the next 30 years.

### Diamond M's Cattle Grazing on the Colville and its Highly Disproportionate Rate of Conflict with Gray Wolves

78.    For roughly the past 75 years, the Forest Service has issued Diamond M Ranch, a partnership of the McIrvin family and reportedly the largest cattle producer in Washington, a series of permits to graze cattle on the Colville National Forest.

79.    Most recently, in 2013, the Forest Service issued Diamond M a 10-year term permit allowing 736 cow and calf pairs to graze between summer and mid-autumn on the Churchill, Lambert, C.C. Mountain, Hope Mountain, and Copper-Mires allotments, which collectively span over 74,000 acres of federal Forest lands in the Colville's northern portion and Kettle River Range.

COMPLAINT                                                                            31

80.     The expansive Kettle River Range is prime wolf country—a rugged,

mountainous, and heavily treed landscape with a significant native prey base.



Photo credit: Timothy Coleman (Executive Director, Kettle Range Conservation Group); image features portions of the C.C. Mountain allotment, with the Profanity Peak Inventoried Roadless Area in the foreground.

81.     Diamond M's federally-permitted cattle grazing on the Colville has

been the source of mounting, high-profile conflicts that have resulted in numerous

preventable wolf deaths.

82.     In 2012, WDFW killed seven of eight wolves from the Wedge Pack

on behalf of Diamond M as a result of cattle predations that occurred on the

northern portion of the Colville.

83.     In 2016, WDFW killed seven wolves from the Profanity Peak Pack on

behalf of Diamond M as a result of cattle predations in the Colville's Kettle River

Range. This lethal control action ultimately destroyed the entire Profanity Peak

COMPLAINT                                                                                    32

Pack as it left only one adult female and three pups, who did not survive to the following year.

84.    In 2017, the Sherman Pack almost immediately moved into the Profanity Peak Pack's former territory. After determining the Sherman Pack was responsible for depredations on Diamond M's cattle in the Colville's Kettle River Range, WDFW killed one of only two of the pack's remaining members, destroying the pack.[10]  In 2017, WDFW also killed two wolves from the Smackout Pack on behalf of another livestock owner as a result of predations on private land adjacent to the Colville and predations on federal lands in the Forest's eastern region.

85.    In 2018, a new wolf pack – the Old Profanity Territory ("OPT") Pack – moved into the territory formerly occupied by the Profanity Peak and Sherman Packs in the Colville's Kettle River Range. On separate occasions that year, WDFW killed two members of the OPT Pack in response to predations of Diamond M's cattle in the Colville's Kettle River Range and one wolf from the Smackout Pack on behalf of Diamond M as a result of predations on private land near the eastern region of the National Forest. In 2018, WDFW also killed one

---

[10] WDFW reported that the Sherman Pack started the year with 5 wolves, but the state agency was unable to later locate two of them and one female was killed by a car in March 2017, thus only 2 wolves remained in this pack by the time WDFW issued its kill order.

COMPLAINT                                                                                      33

wolf from the Togo Pack on behalf of another livestock owner as a result of predations in the Colville's Kettle River Range.

86.    In January 2019, WDFW determined members of the OPT Pack killed three cattle Diamond M had *unlawfully* left in the Kettle Range mountains over the winter, beyond the season of use dates authorized in its federal grazing permit. WDFW ultimately killed eight wolves from the OPT Pack, destroying the entire pack, after additional depredations of Diamond M's cattle in the Colville's Kettle River Range the following summer.

87.    Of the four packs WDFW has destroyed since 2012, all were killed on behalf of Diamond M Ranch within the Colville National Forest: Wedge Pack (2012), Profanity Peak Pack (2016), Sherman Pack (2017), and OPT Pack (2019).

88.    Since 2012, the state has spent well over $320,000.00 of taxpayer dollars carrying out these lethal control actions against wolves.

89.    Year after year, since 2012, Diamond M has lost cattle to wolves on federal allotments within the Colville while neighboring permittees have been able to fairly effectively protect their herds.

90.    Since WDFW finalized its state recovery plan for wolves in 2011, many of Washington's livestock owners have agreed to cooperate with the state agency to employ non-lethal measures to reduce wolf-livestock conflicts.

91.     WDFW offers livestock owners the opportunity to enter into Damage Prevention Cooperative Agreements, which provides a cost-share for the implementation of non-lethal conflict prevention measures, such as range riders, improved sanitation practices (*e.g.* treatment or removal of injured or dead livestock), checking on livestock daily, fladry (the use of flagging to frighten away predators) and fencing.

92.     Diamond M has steadfastly refused to become a signatory to WDFW's Damage Prevention Cooperative Agreement, to cooperate with WDFW on employing non-lethal deterrent measures, or to follow the recommendations of conservation biologists for best management practices.

93.     WDFW's 2016 predation reports show Diamond M has turned young calves out on the Colville's federal allotments before they had reached 200 pounds (the weight both USFWS and WDFW experts recommend to minimize wolf depredation potential).

94.     WDFW's reports also show that many of Diamond M's cows and calves were not discovered for days, or even weeks, after they were injured by wolves, indicating the permittee either failed to maintain a regular presence on the allotments to monitor the health of its herds or intentionally left injured cattle in the allotments. Either scenario is problematic as wolves are drawn to sick or

COMPLAINT                                                                                            35

injured livestock, and leaving them on the allotments puts all surrounding cattle at greater risk.

95.    Unlike the surrounding permittees who suffered no livestock predations from wolves in 2019, Diamond M refused the use of state-funded range riding services contracted by WDFW to protect its cattle. WDFW officials have noted that Diamond M will not use its contracted range riders because of fear they would report allotment violations to the Forest Service. WDFW officials further acknowledged that over each of the past four years that it killed wolves in response to depredations of Diamond M's cattle on the Colville's federal allotments, that Diamond M "never had actual, quality range riding on this landscape." In fact, the only range riders Diamond M allowed to monitor its cattle while grazing public lands on the Colville in 2017 and 2018 were a family that claimed compensation from the state for range riding on dates when a WDFW criminal investigation revealed they were far from the allotments (*e.g.* shopping in Idaho, at a casino, or hotels in Spokane).

96.    As the following chart used in the WA wolf plan shows, wolves are generally responsible for fewer than 0.1% of cattle losses, with the vast majority of deaths from illness, weather, and calving problems.

//

///

COMPLAINT                                                                          36



97.    Between 2012 and 2018, when the Washington wolf population grew from a minimum of 51 wolves to 126, WDFW confirmed 45 cattle were killed by wolves (of the roughly 1.2 to 1.4 million head of cattle annually grown in Washington state)[11]—an average of 6.4 attributed to wolves per year. These numbers are consistent with data gathered for two Washington State University ("WSU") studies, which found wolf predations on Washington livestock were extremely rare.[12] One study collared 588 calves in 10 herds over two grazing

---

[11]U.S. DEPT. OF AG., NAT'L AG. STATISTICS SERV., CATTLE REPORT (January 2020) https://www.nass.usda.gov/Publications/Todays_Reports/reports/catl0120.pdf

[12] The data for these WSU studies was gathered by Dr. Robert Wielgus, Director of WSU's Large Carnivore Conservation Lab, from WSU radio-telemetry data of

COMPLAINT                                                                                37

seasons, but detected no wolf-caused mortalities in any collared animals—

extrapolating that livestock losses to wolves were at most 0.81%.[13] Another study,

by a WDFW biologist (the "Spence Study"), monitored 10 wolf packs over three

grazing seasons, finding that, on average, wolves killed just 0.3 percent of cattle in

wolf pack territory.[14] But there was one big exception: the predation rate on cattle

belonging to Diamond M was roughly *14 times* higher than the average for other

Washington livestock owners in wolf territory. *Id*.

98.    This dramatic difference in depredation rates is not because wolf

territories center solely around the five allotments permitted to Diamond M: the

OPT pack's territory alone overlapped with 13 different federal grazing allotments.

The following map of known wolf activity on the Colville in 2016 that was

developed by the Forest Service illustrates this point.

wolves and livestock, date and time stamped video records of wolves and

livestock, and WDFW's public records.

[13] Brown, J. & Wielgus, R. (Chair) (WSU 2016), "Mortality of Range Livestock in

Wolf-Occupied Areas of Washington," Abstract.

[14] Spence, G. & Wielgus, R. (Chair) (WSU 2017), "Wolf Predation on Livestock in

Washington," Abstract.

COMPLAINT                                                                                    38



99.    For more than a decade, Diamond M's owners have publicly aired

their unwillingness to coexist with wolves. Indeed, although Diamond M raises its

cattle for slaughter and profit, it refuses to enter into a contract with the state that

would give it compensation for its losses to wolves—in exchange for which it

would have to agree to cooperate with WDFW to protect its livestock. Instead,

Diamond M's owner insists the only compensation he is interested in is "a dead

wolf for every dead calf."[15]

---

[15]Matthew Weaver, *Wolf Kill Fails to Placate Washington Rancher*, THE BLUE
MOUNTAIN EAGLE, Aug. 8, 2012, https://www.bluemountaineagle.com/news/wolf-

COMPLAINT                                                                                    39

**The Forest Service's Failure to Responsibly Manage
Livestock Grazing on the Colville**

100.   The Forest Service, as the federal land manager and agency responsible for administering livestock grazing on National Forest lands, has broad authority to modify, cancel, or suspend grazing permits; update AMPs; and adjust annual grazing instructions for the benefit of special resources that occur on federal allotments. The Forest Service also has a heightened duty under NFMA to protect the Forest's sensitive species like the gray wolf because their regional population viability is already a concern.

101.   For the past several years, wildlife advocates, concerned citizens, Public Employees for Environmental Responsibility (PEER), and even the Forest Service's own employees, have called upon the federal managers of the Colville to at least modify, if not suspend, Diamond M's federal grazing privileges in light of this permittee's well-documented recalcitrant behavior and high-conflict grazing practices; urging agency officials fulfill their obligation to ensure public lands grazing does not threaten the recovery and viability of this ecologically important, native carnivore as it gains a foothold in its historic habitat.

102.   Indeed, WDFW's repeated killing of wolves in response to Diamond M's cattle depredations on the Colville, when little to no non-lethal deterrent

kill-fails-to-placate-washington-rancher/article_a991a8b1-33b3-55ea-959f-dccbbcee38d0.html

COMPLAINT                                                                                  40

measures had been in place, even prompted Washington Governor Jay Inslee to write WDFW in September 2019, calling the state agency's annual status quo wolf killing "simply unacceptable;" requesting WDFW work with the Forest Service "to make changes that would reduce the conflicts, including changes in allotment policies for public lands that are prime wolf habitat, the addition of more intensive range riding, and other proven or promising methods."

103.   Ignoring this public outcry, the Forest Service continues authorizing the same problematic cattle grazing it knows will likely end in dead wolves, without imposing any modifications to avoid or reduce wolf-livestock conflicts on the Colville.

104.   The Forest Service can adjust the timing, intensity, duration, and location of annual grazing. Yet the agency instead authorizes Diamond M to repeatedly concentrate its cattle in known core wolf areas, even after the discovery of active wolf rendezvous sites and nearby dens. In 2016, after Diamond M and the Forest Service learned that a salt block was placed near an active den site, the agency did not require Diamond M to move its cattle to safety in more distant pastures, and Diamond M refused to do so on its own accord. Worse yet, the Forest Service authorized the salt blocks to remain in this high conflict area for the 2018 and 2019 grazing seasons, which is frequently near den and/or rendezvous sites. And then the Forest Service sat idly by while the predations piled up and Diamond

COMPLAINT                                                                                    41

M's demands for dead wolves were swiftly met by a series of lethal control actions by WDFW.

105.    The Forest Service has ignored numerous other grazing management options to reduce wolf-livestock conflicts and in turn protect the wolf's future viability on the Colville. For instance, in addition to modifying the timing and location of grazing, such as by delaying turnout in core wolf areas, the Forest Service can also modify the class of livestock permitted to graze federal allotments. Currently, it authorizes Diamond M to graze 736 cow/calf pairs, which allows up to 736 especially vulnerable young calves to graze in prime wolf country. Rather than consider modifying Diamond M's permit to only allow grazing adult cows, or at least require calves to be above 200 pounds in weight by turnout, the Forest Service again has done nothing.



Photo credit: Timothy Coleman (Executive Director, Kettle Range Conservation Group); image of cows with young calves in the Deadman pasture on the C.C. Mountain allotment, June 8, 2020.

COMPLAINT                                                                            42

106.   The Forest Service could also require permittees to use consistent and reliable range riders, monitor the location and health of their herds on a frequent basis, and immediately remove sick, injured, or dead cattle to avoid attracting wolves to areas actively being grazed by livestock. But it has not required Diamond M to do so.

107.   The Forest Service has also not taken any corrective action in response to Diamond M's repeated failure to timely move its cattle off the National Forest. Taking corrective action could have avoided livestock depredations and subsequent wolf killings. Violating the terms of its grazing permit, AMPs, and annual grazing instructions, Diamond M has left its cattle to languish in the rugged, forested terrain of the Colville's Kettle River Range beyond the permitted season of use dates for each of the five allotments, which all expire between September 30 and October 31, including deep into winter. The Forest Service has broad authority to impose repercussions for permit non-compliance. Yet the agency again turns a blind eye. Also, in 2018, the Forest Service extended Diamond M's season of use date for the C.C. Mountain allotment, via a letter, *after* the authorized period of use on that allotment expired and a depredation of cattle that Diamond M failed to timely remove by its specified October 15 off-date occurred. The Forest Service's action extending the season of use enabled WDFW to issue a late season kill order in response.

COMPLAINT                                                                                          43

## The Forest Service's Outdated NEPA Analyses and AMPs
## for Diamond M's Grazing

108.   The wolf's return to the Colville and several consecutive years of conflicts with Diamond M's cattle grazing on the Forest triggered the agency's duty to supplement its severely outdated environmental analyses for the five allotments permitted to Diamond M and the resulting Allotment Management Plans that guide site-specific grazing management thereon.

109.   But instead of publicly disclosing and carefully assessing the environmental impacts of Diamond M's cattle grazing in prime wolf country to this state-listed endangered and sensitive species, as NEPA requires, the Forest Service continues to rely on allotment-specific management direction, AMPs, that were developed from analyses for the Churchill, Lambert, C.C. Mountain, Hope Mountain, and Copper-Mires allotments (collectively the "Diamond M allotments") that mostly date back to the 1970s.

110.   Specifically, the Forest Service's grazing authorizations for Diamond M continue to rely on the following:

- A 1976 "Environmental Analysis Report" and resulting AMP for the Copper-Mires allotment;
- Three separate EAs and corresponding AMPs from 1979 for the Lambert, C.C. Mountain, and Hope Mountain allotments;
- A 1985 AMP for the Churchill allotment; and
- A 2007 Decision Memo that categorically excluded grazing management on the Hope Mountain and Churchill allotments, among other adjacent allotments, from environmental review in an EA or EIS

COMPLAINT                                                                      44

under the "2005 Grazing Rider" FY 2005 Consolidated Appropriations Act, Pub. L. No. 108-447, Sec. 339.

111.    Thus, more than 35 to 40 years have passed since the Forest Service assessed the environmental impacts of, or need to modify, its grazing management direction for the Diamond M allotments.

112.    On March 27, 2020, Plaintiffs WildEarth Guardians and WWP sent the Forest Service a letter identifying the need for the agency to supplement its outdated NEPA analyses for the Diamond M allotments given the wealth of significant new information and changed circumstances that have emerged since its prior decades-old analyses and AMPs.

113.    In addition to the obvious new facts and circumstances surrounding the gray wolf's return to the Colville and years of conflicts with Diamond M's cattle, Plaintiffs' letter highlighted recommendations from state and federal wildlife agencies for reducing wolf-livestock conflicts. Plaintiffs' letter referenced numerous scientific studies supporting the efficacy of such non-lethal measures. It also referenced many studies that show killing wolves in response to livestock depredations is unlikely to prevent future conflicts from recurring and may even *increase* conflicts by causing compensatory breeding and disrupting complex, wolf pack dynamics. Plaintiffs' letter additionally pointed to several recent studies demonstrating the critically important ecological role that wolves, as top predators, play in recovering and maintaining healthy ecosystems and how wolf removal has

COMPLAINT                                                                                                  45

cascading negative effects. Plaintiffs also sent most of these studies and scientific literature references on a thumb drive to the Colville's Forest Supervisor in hopes of facilitating a prompt review.

114.  To date, however, the Forest Service has not responded to Plaintiffs' letter or issued any public notice indicating it would prepare supplemental NEPA analyses to address the impacts of Diamond M's grazing on the Colville's wolves and the need to update stale AMPs to provide new management direction, based on current science, for mitigating wolf-livestock conflicts on these federal Forest lands.

**Potential Impacts to ESA-Listed Species and Their Habitats
from Diamond M's Grazing**

115.  The Forest Service has additionally failed to consider the potential impacts of Diamond M's grazing on gravely imperiled species federally protected under the ESA. Threatened bull trout and its critical habitat, endangered woodland caribou and its critical habitat, threatened grizzly bear, and threatened Canada lynx are all present on the Colville National Forest. There is also suitable habitat for yellow-billed cuckoo (listed threatened species) and both wolverine and whitebark pine are present (candidate species).

116.  The Kettle-Wedge "core area" is considered important for the recovery of Canada lynx in Washington, portions of which overlap with the Diamond M allotments. The USFWS defines core areas as those areas with the

COMPLAINT                                                                46

strongest long-term evidence of the persistence of lynx populations over time within the contiguous United States. Among other potential effects to lynx, livestock grazing can indirectly affect this threatened species by adversely affecting riparian areas that provide habitat for snowshoe hare, a primary food resource for lynx. Lynx are also sensitive to human disturbance, so livestock grazing and associated activities can impair the lynx's need for seclusion.

117.    Threatened grizzly bears have been documented on adjacent lands and may also be present on the Copper-Mires, Lambert, and C.C. Mountain allotments. Among other potential effects, livestock grazing may adversely affect this listed species through direct and indirect competition for forage, and the potential for disturbance and/or mortality when grizzly bears come into contact with people and/or livestock.

118.    Whitebark pine, a candidate species for federal listing and important food source for threatened grizzly bears, is also present on the Diamond M allotments and may be adversely affected by livestock grazing. Livestock tend to seek shade under large whitebark pine trees. This behavior exacerbates soil compaction and erosion around the tree trunk, which can expose the roots and can reduce the likelihood of seedling establishment. Cattle can also create conditions that favor the establishment of faster-growing sub-alpine fir and other shade tolerant species that displace whitebark pine.

COMPLAINT                                                                47

119.   Upon information and belief, the Forest Service has failed to prepare a

Biological Assessment and consult the USFWS, pursuant to the ESA, since at least

2000 regarding the impacts of Diamond M's cattle grazing on the Copper-Mires,

Lambert, and C.C. Mountain allotments to federally listed threatened and

endangered species, proposed and/or candidate species (*e.g.* Canada lynx, grizzly

bear and whitebark pine), which are known or suspected to be present in those

areas. Consequently, on April 1, 2020, Plaintiffs WildEarth Guardians and WWP

sent the Forest Service a sixty-day notice of intent to bring legal action pursuant to

the ESA for these failures.

**FIRST CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT**
**(Failure to Address Impacts to Wolves Under the New Colville Forest Plan**
**and to Evaluate Reasonable Grazing Management Alternatives that Reduce**
**Wolf-Livestock Conflicts)**

120.   Plaintiffs reallege and incorporate by reference the preceding

paragraphs.

121.   The Forest Service failed NEPA's hard look mandate in multiple

respects with regard to the revised Colville Forest Plan:

A. The FEIS for the 2019 Colville Forest Plan failed to publicly disclose

and analyze the potential direct, indirect, and cumulative

environmental effects of authorizing livestock grazing under newly

proposed management direction to state-listed endangered and

COMPLAINT                                                          48

sensitive gray wolves. For example, the FEIS failed to even

acknowledge and disclose environmental baseline conditions with

respect to gray wolves returning to the Colville over the last decade,

establishing breeding pairs and packs, and contributing to this

National Forest's diversity of plant and animal communities;

B. The FEIS failed to disclose and analyze how the series of conflicts

between this sensitive species and federally permitted cattle grazing

on the Forest has affected wolves and their current Forest-wide

population status or trend;

C. The FEIS failed to analyze, in light of this series of past conflicts, how

the continuation of livestock grazing under the revised Forest Plan

may affect the wolf's future viability on the Colville and, in turn, the

diversity of wildlife on the National Forest;

D. The FEIS failed to consider how abandoning stringent management

standards under the prior 1988 Colville Forest Plan, which expressly

required the agency to consider incorporating measures for protecting

sensitive species like the gray wolf and reducing wildlife-livestock

conflicts into allotment-specific AMPs, may impact wolves on the

National Forest;

E.  The Forest Service failed to thoroughly consider and objectively evaluate an adequate range of alternatives because not one of the six planning alternatives the agency assessed in detail included Forest-wide grazing directives that incorporated measures for reducing wolf-livestock conflicts.

122.    The Forest Service thus failed to disclose and analyze all the revised Forest Plan's environmental impacts, and failed to evaluate reasonable alternatives for Forest-wide grazing management direction, contrary to NEPA requirements. 42 U.S.C. § 4332(2)(C); 40 C.F.R. Parts 1502 and 1508.

123.    The FEIS, and the revised Colville Forest Plan relying on that FEIS, are therefore arbitrary, capricious, and not in accordance with law and should be set aside pursuant to the APA. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF**
**VIOLATIONS OF THE NATIONAL ENVIRONMENTAL POLICY ACT**
**(Failure to Prepare Supplemental NEPA Analyses for**
**the Diamond M Allotment Management Plans)**

124.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

125.    NEPA's regulations require an agency to prepare supplemental NEPA analysis if the agency makes substantial changes to the proposed action or if there are significant new circumstances or information relevant to environmental

COMPLAINT                                                                                          50

concerns and bearing on the proposed action or its impacts. 40 C.F.R. §

1502.9(c)(1)(i)-(ii).

126.   The Ninth Circuit has also determined that environmental analyses

must be completed before an agency makes any "irreversible and irretrievable

commitment of resources." *See ONDA v. Sabo*, 854 F. Supp. 2d 889, 923-24 (D.

Or. 2012) (citing *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988); *Metcalf*

*v. Daley,* 214 F.3d 1135, 1143 (9th Cir. 2000); *WWP v. BLM,* Civ. No. 09–0507–

E–BLW, 2009 WL 3335365, at *6 (D. Idaho Oct. 14, 2009)).

127.   Events and information including, but not limited to those listed

herein, constitute significant new circumstances or information relevant to

environmental concerns regarding the continued authorization of cattle grazing on

the Diamond M allotments. Principally, state-listed endangered and sensitive gray

wolves have returned to the Colville; the Kettle River Range is prime wolf habitat

with many active core wolf areas for the past several years; wolves have been

active on all the Diamond M allotments; and conflicts between wolves and

Diamond M's federally permitted cattle have resulted in the lethal removal of at

least 26 wolves and four wolf packs as of the date of this Complaint. Current

science also shows conflicts are very likely to recur, despite the state's lethal

removal activities on Diamond M's behalf, in the absence of science-backed non-

lethal measures that mitigate wolf-livestock conflicts.

COMPLAINT                                                                                    51

128.   The Forest Service relies on AMPs and their accompanying environmental analyses that are more than three decades old to continue authorizing grazing on the Diamond M allotments. The Forest Service's failure to complete supplemental NEPA analysis that considers this ongoing action's impacts on wolves and to update decades-old AMPs in light of these changed circumstances and new information, as NEPA requires, is agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. § 706(1).

129.   To the extent the Forest Service affirmatively decided supplementing Diamond M's outdated NEPA analyses was unwarranted, such as through Supplemental Information Reports (SIRs), those decisions are arbitrary, capricious, and not in accordance with law and should be set aside pursuant to the APA. 5 U.S.C. § 706(2).

### THIRD CLAIM FOR RELIEF
### VIOLATIONS OF THE NATIONAL FOREST MANAGEMENT ACT
### (Revised Colville Forest Plan Fails to Meet NFMA's Requirements)

130.   Plaintiffs reallege and incorporate by reference the preceding paragraphs.

131.   As noted, NFMA and its regulations impose both procedural and substantive requirements for Forest Plans. 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. §§ 219.19; 219.20; 219.26 (1982).

COMPLAINT                                                                                          52

132.   The Forest Service violated NFMA's procedural requirements by failing to consider during the Forest Plan revision process: (1) how the Colville's wildlife diversity will be affected by the continuation of livestock grazing under management direction that omits any measures for mitigating wolf-livestock conflicts so as to reduce or avoid the lethal removal of wolves from the National Forest in response to depredations, 36 C.F.R. § 219.26 (1982), and (2) which portions of the Colville are suitable for grazing in light of repeated wolf-livestock conflicts, or any measures for "regulating" conflicts between livestock and wolves. 36 C.F.R. § 219.20 (1982).

133.   The Forest Service also violated NFMA's substantive requirements by failing to adopt management directives in the revised Colville Forest Plan related to livestock grazing to ensure viable populations of gray wolves will be maintained on the Colville National Forest. 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. § 219.19 (1982). Livestock grazing direction from the Forest Plan is implemented through term grazing permits, AMPs, and annual grazing/operating instructions (AOIs), including the 2020 annual authorizations for Diamond M.

134.   Accordingly, the revised Colville Forest Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA. 5 U.S.C. § 706(2)(A).

//

///

COMPLAINT                                                                                53

# FOURTH CLAIM FOR RELIEF
## VIOLATIONS OF THE NATIONAL FOREST MANAGEMENT ACT
### (Diamond M's Grazing Authorizations are Inconsistent with Forest Plan Direction)

135.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

136.    As required by NFMA and its planning rules, all projects and activities authorized by the Forest Service must be consistent with the applicable Forest Plan. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15 (2012). A project or activity must be consistent with *all* applicable plan components, including the desired conditions, standards and guidelines. *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).

137.    The revised Colville Forest Plan includes the following relevant management directive:

> ***FW-DC-WL-10. Risk Factors for all Surrogate Species***
> Risk factors (such as roads, uncharacteristic wildfire, unregulated livestock use, introduced species, invasive species, and disturbance during critical time periods) for all surrogate species are reduced to contribute to the viability of surrogate species and associated species.

138.    According to the revised Forest Plan: "Surrogate species represent other species that share similar habitat and risk factors and include Region 6 sensitive species, state-listed species, or other species for which the published literature has identified concerns for their viability." Thus, the gray wolf qualifies

COMPLAINT                                                                              54

as a surrogate species by virtue of being both a state-listed endangered species and a Region 6 sensitive species.

139.    The Forest Service has acted inconsistently with this Forest Plan management directive by authorizing Diamond M's annual grazing in 2020, under the very same terms and conditions that resulted in several consecutive years of recurring wolf-livestock conflicts and subsequent lethal wolf removal from the Colville, without imposing any meaningful risk reduction measures to contribute to the wolf's future viability on this National Forest.

140.    Accordingly, the Forest Service's 2020 grazing authorizations for the Diamond M allotments are arbitrary, capricious, an abuse of discretion, and not in accordance with NFMA. 5 U.S.C. § 706(2)(A).

**FIFTH CLAIM FOR RELIEF**
**VIOLATIONS OF THE ENDANGERED SPECIES ACT**
**(Failure to Consult over the Impacts of Diamond M's Grazing)**

141.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

142.    ESA section 7(a)(2) requires every federal agency, in consultation with the USFWS, to "insure that any action authorized, funded, or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). An agency

must consult with USFWS under section 7(a)(2) whenever it takes an action that "may affect" a listed species, and complete such consultation before proceeding with the action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a).

143.   At least since 2000, the Forest Service has failed to prepare a Biological Assessment to determine whether annual grazing on the Copper-Mires, Lambert, and C.C. Mountain allotments "may affect" listed, proposed and/or candidate species such as Canada lynx, grizzly bear and whitebark pine that may be present in the action area. Consequently, the Forest Service failed to consult USFWS as required by the ESA and its implementing regulations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. Part 400.

144.   The Forest Service's refusal to ensure no jeopardy to listed, proposed and/or candidate species through consultation with the USFWS is a violation of its mandatory, affirmative duties under section 7(a)(2) of the ESA.

145.   This claim is brought pursuant to the judicial review provision of the ESA, 16 U.S.C. § 1540(g).

## REQUEST FOR RELIEF

A.   Adjudge and declare that the Forest Service's FEIS/ROD and revised Colville Forest Plan violated NEPA and/or NFMA, with respect to wolves and domestic livestock grazing, and thus is arbitrary, capricious, an abuse of discretion,

COMPLAINT                                                                56

contrary to law, and/or issued without observance of procedure required by law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

B.    Adjudge and declare that the Forest Service violated NEPA by failing to supplement decades-old environmental analyses for the Diamond M Allotment Management Plans and order the Forest Service to prepare supplemental NEPA analyses that consider wolf-livestock conflicts on the Diamond M allotments before issuing further grazing authorizations for these five allotments, 5 U.S.C. § 706(1);

C.    Adjudge and declare that the Forest Service's 2020 grazing authorizations for the five Diamond M allotments violated NFMA, and thus are arbitrary, capricious, an abuse of discretion, and/or contrary to law under the judicial review standards of the APA, 5 U.S.C. § 706(2);

D.    Adjudge and declare that the Forest Service violated the ESA by failing to prepare a BA and consult the USFWS over potential impacts of livestock grazing on the Copper-Mires, Lambert, and C.C. Mountain allotments to listed, proposed and/or candidate species that may be present in the action area;

E.    Vacate and set aside the revised Colville Forest Plan and underlying FEIS/ROD as they relate to wolves and domestic livestock grazing;

F.    Enter such other declaratory relief, and temporary, preliminary, or permanent injunctive relief as may be requested hereafter by Plaintiffs;

COMPLAINT                                                                                            57

G.      Retain jurisdiction over this case until the agency complies with NEPA, NFMA, and/or the ESA;

H.      Award Plaintiffs their reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.* and/or the ESA, 16 U.S.C. § 1540(g)(4); and

I.      Grant such further relief as the Court deems just and proper.

Respectfully submitted this 17th day of June 2020.

*/s/ Jennifer Schwartz*
Jennifer R. Schwartz

*Of Counsel for Plaintiffs*

COMPLAINT                                                                                              58

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on June 17, 2020, I electronically filed the foregoing

3

4

Complaint, Civil Cover Sheet and Proposed Summonses with the Clerk of the

5

Court using the CM/ECF system, which will send notification of this filing to the

6

7

attorneys of record.

8

9

/s/ *Jennifer Schwartz*

10

Jennifer R. Schwartz

11

12

*Of Counsel for Plaintiffs*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT                                                                                   59