FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 10, 2021

SEAN F. MCAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| WILDEARTH GUARDIANS; WESTERN WATERSHEDS PROJECT; and KETTLE RANGE CONSERVATION GROUP, | NO:  2:20-CV-223-RMP |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |
| v. | |
| US FOREST SERVICE; GLENN CASAMASSA, Pacific Northwest Regional Forester; and RODNEY SMOLDON, Forest Supervisor, | |
| Defendants | |
| and | |
| DIAMOND M RANCH, a Washington General Partnership, | |
| Defendant-Intervenor. | |

BEFORE THE COURT is Plaintiffs' Motion for Summary Judgment, ECF

No. 29; Plaintiffs' Motion to Consider Extra-Record Evidence in Support of

Plaintiffs' Motion for Summary Judgment, ECF No. 34; Defendants' Cross-Motion

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT ~ 1

for Summary Judgment, ECF No. 37; and Plaintiffs' Motion to Strike Federal Defendants' and Defendant-Intervenor's Extra-Record Declarations and Exhibits, ECF No. 46.

Plaintiffs Wildearth Guardians, Western Watersheds Project, and Kettle Range Conservation Group (collectively "Plaintiffs") allege that Defendants United States Forest Service (the "Forest Service"), Glen Casamassa, and Rodney Smoldon (collectively "Federal Defendants") failed to adequately assess the impacts to gray wolves of federally permitted livestock grazing in the Colville National Forest in violation of the National Environmental Policy Act ("NEPA") and National Forest Management Act ("NFMA"). *See* ECF No. 1. Plaintiffs further allege that Federal Defendants failed to consult with the United States Fish and Wildlife Service ("USFWS") over the potential impacts of livestock grazing to endangered species under the Endangered Species Act ("ESA"). *See id.*

The Court heard oral argument via video conference. Jennifer Schwartz argued on behalf of Plaintiffs. The Federal Defendants were represented by Emma Hamilton, Shawn Pettigrew, and Michelle Spatz. Chris Montgomery appeared on behalf of Defendant-Intervenor Diamond M. Ranch. The Court has reviewed the motions, the record, heard oral argument, and is fully informed.

For the reasons discussed *infra*, the Court finds that Plaintiffs have not shown the requisite standing for their claims under the National Environmental Policy Act and National Forest Management Act because the asserted injury is not redressable

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 2

by the Court as the Washington Department of Fish and Wildlife is the lead agency primarily responsible for wolf management operations including the lethal removal of gray wolves.

Plaintiffs also cannot show any injury from the revised 2019 Forest Plan absent a site-specific injury causally related to an alleged defect in the 2019 Forest Plan. The Court further finds that Plaintiffs' NFMA challenges to the 2019 Forest Plan are not ripe for adjudication because the Forest Plan neither authorizes livestock grazing nor wolf depredations.

Finally, the Court finds that the Forest Service did not violate Section 7 of the Endangered Species Act by not consulting with the U.S. Fish and Wildlife Service (USFWS) over the effects of cattle grazing to the whitepark pine, Canada lynx, or grizzly bear where the Forest Service satisfied its consultation obligations or consultation was not required by reason of the species either being only a "candidate" for federal listing or not present in the allotments.

Accordingly, the Court enters summary judgment in favor of the Federal Defendants.

## BACKGROUND

**Gray Wolves in Washington State**

Gray wolves were classified as an endangered species in Washington State under the provisions of the ESA in 1973. DM03376. In 2011, wolves in the eastern third of Washington were removed from federal protections under the ESA. *Id.* As

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 3

of January 4, 2021, the gray wolf was removed from the Federal list of Endangered and Threatened Wildlife.  85 Fed. Reg. 69778 (Nov. 3, 2020) (Final Rule).  The gray wolf remains a state-listed endangered species in Washington and is designated as a "sensitive species" in the Pacific Northwest region.  FP108617.

The Washington Department of Fish and Wildlife ("WDFW") is the primary agency responsible for managing wolves in the Eastern Washington recovery area guided by the Wolf Conservation and Management Plan.  FP015348–015647.

"One goal of the Wolf Conservation and Management Plan for Washington (Plan) is to manage wolf-livestock conflicts in a way that minimizes livestock losses while at the same time not impacting the recovery and long-term perpetuation of a sustainable wolf population."  DM03391.  "The WDFW and livestock producers can implement non-lethal and preventative control measures any time they deem necessary throughout Washington."  *Id.*  "The WDFW has full management authority of wolves in the Eastern Washington recovery area . . . and under state law RCW 77.12.240, can implement lethal measures to control depredating wolves when it is deemed necessary to detour chronic livestock depredations."  *Id.*; FP015435 ("Wherever wolves are federally listed in Washington, the U.S. Fish and Wildlife Service and USDA Wildlife Services are the lead agencies to respond to reports of wolf depredations.").

Pursuant to the Wolf Conservation and Management Plan, "[l]ethal removal may be used to stop repeated depredation if it is documented that livestock have

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 4

clearly been killed by wolves, non-lethal methods have been tried but failed to resolve the conflict, depredations are likely to continue, and there is no evidence of intentional feeding or unnatural attraction of wolves by the livestock owner." FP015438.

Since 2012, WDFW has lethally removed 34 wolves from 10 packs in response to wolf-livestock conflicts. ECF No. 29 at 17; *see* AR01824 ("WDFW documented 21 wolf mortalities in 2019; nine were removed by the department in response to wolf-caused livestock deaths and injuries . . . [and] two wolves [were] killed by landowners protecting livestock (caught in the act)"). As of December 31, 2019, WDFW counted 108 wolves 21 packs, in addition to 37 wolves in five packs counted by the Confederated Tribes of the Colville Reservation. AR01823–01824. In 2019, the "state's minimum year-end wolf population increased by 11 percent and mark[ed] the 11th consecutive year of population growth." *Id.*

**Grazing in the Colville National Forest**

The Colville National Forest encompasses about 1.1 million acres in Washington State. FP014458. "The Multiple Use Sustained Yield-Act of 1960 mandates that national forests are administered for a variety of uses including livestock grazing." FP014485.

"Livestock grazing on the Colville National Forest is an important use to the local ranching industry and local communities." FP108812. The majority of permitted grazing is for cattle with only one sheep allotment (currently vacant)

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 5

remaining.  *Id*.  Grazing allotments on the Forest cover about 745,000 acres of administered forest lands.  FP108811.  There are 58 grazing allotments where 42 currently have permitted use and 16 are in a vacant status.  FP108813.

The Forest Service manages livestock grazing on the national forests by using three separate decisionmaking processes:  (1) federally issued grazing permits; (2) allotment management plans ("AMPs"); and (3) annual operating instructions ("AOIs").  ECF No. 1 at 15 (citing *Or. Natural Desert Ass'n v. U.S. Forest Serv*., 465 F.3d 977, 979 (9th Cir. 2006))("*ONDA*").

A grazing permit is a "document authorizing livestock to use National Forest System or other lands under Forest Service control for the purpose of livestock production."  *ONDA*, 465 F.3d at 979–80 (citing 36 C.F.R. § 222.1(b)(5); 43 U.S.C. § 1702(p)).  "A permit grants a license to graze and establishes: (1) the number, (2) kind, (3) and class of livestock, (4) the allotment to be grazed, and (5) the period of use."  *Id.* at 980 (citing 36 C.F.R. §§ 222.1–222.4; 43 U.S.C. § 1752).  The Forest Service generally issues ten-year term permits.  *Id.* (citing 36 C.F.R. § 222.3(c)(1)).

"While a forest plan is an overarching land management directive for an entire forest-wide unit within the National Forest System, the AMP is a land management directive for a specific allotment within a national forest that the Forest Service has designated for livestock grazing."  *ONDA*, 465 F.3d at 980 (citing *Wilderness Soc'y v. Thomas*, 188 F.3d 1130, 1133 (9th Cir. 1999).)  In other words, AMPs are "site-specific" prescribing the manner in, and extent to which, grazing operations on a

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 6

particular allotment will be conducted in order to meet multiple-use objectives. *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 312 F. Supp. 2d 1337, 1340 (D. Or. 2004). The AMP must be consistent with the applicable forest plan. *ONDA*, 465 F.3d at 980 (citing 16 U.S.C. § 1604(i); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1062 (9th Cir. 2002)); *see also* FP014485 ("Allotment management plans provide site-specific details for management of the resource and identify mitigation measures needed to reduce identified impacts in order to meet or move toward management objectives.").

The Forest Service also typically issues yearly instructions to grazing permittees through annual operating instructions. Generally, the AOI annually conveys long-term directives into instructions to the permittees for annual operations. *Id.* "Because an AOI is issued annually, it is responsive to conditions that the Forest Service could not or may not have anticipated and planned for in the AMP or grazing permit, such as . . . [the] degree of risk to threatened or endangered species affected by grazing." *Id.* at 980–81 (9th Cir. 2006).

Here, however, the Forest Service maintains that it does not issue AOIs in implementing its grazing program. ECF No. 37 at 54. Rather, for the 2020 grazing season, the Forest Service "prepared notes for the permittee identifying the number of livestock to be grazed on the allotments covered by the 2013 Permit that season and outlining various guidelines, reporting requirements, and other matters." *Id.* (citing AR01412–1414).

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 7

**Grazing by Defendant-Intervenor Diamond M Ranch**

In 2013, the Forest Service issued Diamond M Ranch a ten-year term permit allowing 736 cow/calf pairs to graze from summer to mid-autumn on the Churchill, Lambert, C.C. Mountain, Hope Mountain, and Copper-Mires allotments under the then-governing 1988 Forest Plan. DM03397–3409. The 2013 Permit incorporates the AMPs for the Churchill, Lambert, CC Mountain, Hope Mountain, and Copper-Mires allotments. DM03404. Plaintiffs assert that "[o]f WDFW's 34 lethal control actions, over 90% were either completely or partially in response to predations of federally permitted cattle grazing on the Colville National Forest, with 30 wolves (88%) being killed largely at the behest of Diamond M." ECF No. 29 at 17.

**Revising the Colville Forest Plan**

In 2011, the Forest Service publicly released its "Proposed Action" for revising the existing land management plan for the Colville National Forest completed in 1988. FP014443. "Plans are strategic in nature, making general decisions that are often referred to as programmatic decisions." FP014449.

The "Proposed Action" noted that "[w]olves have been documented in the planning area, including den and rendezvous sites with wolf pups" and "[t]he revised forest plan needs to address how these sites would be protected." FP014478. The "Proposed Action" further noted with respect to grazing that "[a]llotment management plans will continue to be developed to design specific criteria for management of the livestock." FP014486.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 8

The Draft Programmatic Environmental Impact Statement (EIS), published in January of 2016, "documents the analysis of six alternatives . . . developed by the Forest Service for the programmatic management of approximately 1.1 million acres administered by the Colville National Forest." FP086935.

The draft EIS used the surrogate species approach to evaluate species and ecosystem viability. FP086943. "The surrogate species assessment process was completed for the planning area in order to determine the baseline conditions for each of the surrogate species . . . and to identify risk factors that influence the viability of surrogate wildlife species." FP086949. The gray wolf is listed as a Region 6 sensitive species and grouped as a "habitat generalist." The gray wolf's "surrogate species" is the wolverine. FP086945.

The Forest Service prepared a Biological Assessment for the Colville National Forest Land and Resource Management Revision dated March 28, 2017, assessing the effects implementing the management activities proposed in the revised Forest Plan. FP098490. "The determinations of these assessments are that implementation of the revised Plan may affect, likely to adversely affect grizzly bear, Canada lynx, woodland caribou, wolverine, whitebark pine, and bull trout." FP098753. The Forest Service requested formal consultation with the United States Fish and Wildlife Service (USFWS) on the action's effect to these species pursuant to Section 7 of the ESA. *Id.*; *see also* FP100513–101045 (Biological Opinion issued by

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 9

USFWS); *see also* AR 102021–102039 (memorandum re: "Status of Gray Wolf in the State and Planning Area" dated January 4, 2018 by Forest Service).

The final EIS (FEIS) for the revised Forest Plan and draft Record of Decision (ROD) were released for public comment in September 2018. FP108129–109666. Relying upon the FEIS, as well as the Biological Opinion issued by the USFWS, the Forest Service adopted the 2019 Forest Plan through an October 2019 Record of Decision (ROD). FP113623–113685; FP109667–110168 (Colville National Forest Land Management Plan).

Plaintiffs filed suit asserting the following claims: (1) the Forest Service failed to address impact to wolves and failed to evaluate reasonable grazing management alternatives that reduce wolf-livestock conflicts in violation NEPA; (2) the Forest Service failed to complete supplemental NEPA analysis for the Diamond M Ranch AMPs; (3) the 2019 revised Colville Forest Plan fails to meet NFMA's requirements; (4) the Forest Service's 2020 grazing authorizations for the Diamond M allotments are inconsistent with the 2019 revised Colville Forest Plan in violation of NFMA; and (5) the Forest Service failed to consult USFWS as required by ESA to determine whether annual grazing "may affect" listed, proposed and/or candidate species such as Canada lynx, grizzly bear, and whitebark pine that may be present in the action area. *See* ECF No. 1.

Plaintiffs seek declaratory relief holding that the FEIS/ROD and revised Colville Forest Plan violated NEPA and/or NFMA and thus are arbitrary,

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 10

capricious, and an abuse of discretion, contrary to law, and/or issued without observance of procedure required by law under the judicial review standards of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2).  ECF No. 1 at 56–57.

## LEGAL STANDARDS

The parties have filed cross-motions for summary judgment under Fed. R. Civ. P. 56.  A court may grant summary judgment where "there is no genuine dispute as to any material fact" of a party's prima facie case, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  Courts may resolve APA challenges via summary judgment.  *See, e.g.*, *Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F.Supp.2d 1230, 1233 (D. Or. 2013) ("'Summary judgment' is simply a convenient label to trigger this court's review of the agency action.").

Under the APA, a court may set aside a final agency action only if it is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law."  5 U.S.C. § 706(2)(A).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 11

"The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citations omitted). The arbitrary and capricious standard is deferential and the court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *Id.* (quoting *Or. Env't Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1987)). However, post-hoc rationalizations cannot support the agencies' action. *See High Country Conservation Advoc. v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1192 (D. Colo. 2014) ("Any post-hoc rationalizations provided by the agencies in this litigation are irrelevant to the question of whether the agencies complied with NEPA at the time they made their respective decisions.").

**National Environmental Policy Act (NEPA)**

"Approval of a resource management plan is considered a major Federal action significantly affecting the quality of the human environment." 43 C.F.R. § 1601.0–6. "NEPA is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1051 (9th Cir. 2012)). NEPA's procedural requirements serve two "twin aims": (1) "it places upon [a federal] agency the obligation to consider every significant

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 12

aspect of the environmental impact of a proposed action" and (2) "it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id*. (quoting *Kern v. U.S. Bureau of Land Mgmt*., 284 F.3d 1062, 1066 (9th Cir. 2002)).

**National Forest Management Act**

"The NFMA sets forth the statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage National Forest System lands." *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 932 (9th Cir. 2010) (citation omitted). "Procedurally, 'all management activities undertaken by the Forest Service must comply with the forest plan, which in turn must comply with the [NFMA].'" *Id*. (citing *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 962 (9th Cir. 2002)). "Substantively, the NFMA also places a duty on the Forest Service to 'provide for diversity of plant and animal communities based on the suitability and capability of the specific land area . . . .'" *Id.* (citing 16 U.S.C. § 1604(g)(3)(B)). "In order to ensure compliance with the forest plan and the [NFMA], the Forest Service must conduct an analysis of each 'site specific' action, such as [grazing], to ensure that the action is consistent with the forest plan." *Id.* (quoting *Idaho Sporting Cong., Inc.*, 305 F.3d at 962).

## DISCUSSION

**I.    Standing**

As a threshold issue, the Federal Defendants contest Plaintiffs' Article III standing for their NEPA and NFMA claims on the basis that Plaintiffs have failed to prove causation and redressability. ECF No. 37 at 24–29. The Federal Defendants further maintain that "Plaintiffs have not demonstrated standing to challenge the 2019 Forest Plan revision because the 2019 Plan does not contemplate wolf removal actions or authorize grazing, and the only project-level grazing authorization Plaintiffs challenge is the 2013 Permit, which is governed by the 1988 Forest Plan." ECF No. 37 at 29.

### A. Motion to Strike Federal Defendants' and Defendant Intervenor's Extra-Record Declarations and Exhibits

Before resolving the issue of whether Plaintiffs' have standing to bring their NEPA and NFMA claims, the Court must first address whether it may consider extra-record declarations and exhibits submitted by the Federal Defendants is appropriate. Plaintiffs move to strike as improper extra-record evidence (1) Diamond M Partnership's Declaration, ECF No. 35-1; (2) Jeffery D. Flood's Declaration, ECF No. 35-2; and (3) Roberto M. Garcia's Declaration and Exhibit A, the current version of the WDFW's "Wolf-Livestock Interaction Protocol" (the "Protocol"), ECF No. 37-1. The Federal Defendants assert that this extra-record evidence may be properly introduced for the sole purpose of rebutting Plaintiffs' standing. *See* ECF No. 48 at 2, 5.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 14

"The party who seeks to invoke federal jurisdiction has the burden of establishing that it has suffered an injury in fact, 'an invasion of a legally-protected interest' that is concrete and particularized, and actual or imminent, not conjectural or hypothetical." *Didrickson v. United States Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir. 1992) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Accordingly, plaintiffs may submit declarations for the purpose of establishing standing. *Friends of Rapid River v. Probert*, 427 F. Supp. 3d 1239, 1263 (D. Idaho 2019) (citing *Nw. Env't. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1527–28 (9th Cir. 1997)) (the court may "consider the affidavits not in order to supplement the administrative record on the merits, but rather to determine whether petitioners can satisfy a prerequisite to this court's jurisdiction.") (citing *Didrickson*, 982 F.2d at 1340).

The authorities cited by the Federal Defendants establish that a plaintiff may cite extra-record evidence for the limited purpose of establishing standing. *Sierra Club v. U.S. E.P.A.*, 762 F.3d 971, 976 n. 4 (9th Cir. 2014) (allowing petitioners leave to submit declarations to establish standing for purposes of appeal); *Didrickson*, 982 F.2d at 1340 (accepting appellant-intervenors' supplemental declarations alleging particularized injury because intervenors were not required to establish standing until they appealed); *Gallatin Wildlife Assoc. v. U.S. Forest Serv.*, CV-15-27-BU-BMM, 2016 WL 6684197, at *2 (D. Montana Apr. 7, 2016) ("The Court shall not admit the Bailey Declaration beyond the purpose of helping

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 15

Plaintiffs establish the irreparable harm element of standing."); *Cent. Sierra Env't Res. Ctr. v. U.S. Forest Serv.*, 916 F. Supp. 2d 1078, 1086 (E.D. Cal. 2013) ("In an action under the APA, the court generally may review only the administrative record, 5 U.S.C. § 706(2)(F), but it may consider extra-record evidence that allows plaintiffs to establish standing.").

The authorities cited by the Federal Defendants do not expressly stand for the proposition that a defendant may introduce extra-record evidence to rebut a plaintiff's standing. Accordingly, Plaintiffs' Motion to Strike, ECF No. 46, is granted and the Court will not consider the extra-record declarations and exhibits proffered by the Defendants in considering whether Plaintiffs have standing for their NEPA and NFMA claims.

## B.  Plaintiffs' Standing

As noted above, the Federal Defendants argue that Plaintiffs do not have standing to bring their NEPA and NFMA claims. ECF No. 37 at 24–29. Plaintiffs assert that the alleged NEPA, NFMA, and ESA violations "cause direct injury to the aesthetic, conservation, recreational, scientific, educational, inspirational, and wildlife preservation interests of Plaintiffs and their members, supporters, and staff." ECF No. 1 at 10; *see also* ECF No. 20-15 (Declaration of Jocelyn Leroux, Western Watersheds Project, Washington and Montana Director); ECF No. 20-16 (Declaration of Timothy Coleman, Executive Director for Kettle Ranger Conservation Group).

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 16

"To establish standing, a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a favorable court decision." *Wildearth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015).  "[A] plaintiff bringing suit under the Administrative Procedure Act for a violation of NEPA must show that his alleged injury falls within the 'zone of interests' that NEPA was designed to protect." *Cantrell v. City of Long Beach*, 241 F.3d 674, 679 (9th Cir. 2001).

An association has standing "to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  There is no dispute that Plaintiffs' members' interests in recreational and aesthetic enjoyment of gray wolves is related to Plaintiffs' respective organizational purposes.

To show a cognizable injury in fact, plaintiff must show that (1) the agency violated certain procedural rules; (2) these rules protect plaintiff's concrete interests; and (3) it is reasonably probable that the challenged action will threaten plaintiff's concrete interests. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969–970 (9th Cir. 2003).  "[A] procedural injury is complete after a

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 17

[land resource management plan] has been adopted, so long as it is fairly traceable to some action that will affect the plaintiff's interests." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1179 (9th Cir. 2011) (citing *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 737 (1998)). The affidavits submitted by Plaintiffs demonstrate that individual members have an aesthetic and recreational interest in the Colville National Forest and the viability of certain species, including the gray wolf. *See* ECF No. 29-15 at 8 (Jocelyn Leroux stating that she has "a strong interest in seeing federal lands managed for healthy native ecosystems where apex predators like wolves are allowed to play their natural role."); ECF No. 29-16 at 8 (Timothy Coleman stating that "[t]he recovery of wolves, lynx and grizzly bear are important to me from an ecological, ethical, and spiritual standpoint.").

The Federal Defendants argue that Plaintiffs fail to show that alleged injuries to those interests through WDFW's lethal wolf removals are "fairly traceable" to the Forest Service's challenged conduct or redressable by future agency action. ECF No. 37 at 24.

"Once a plaintiff has established an injury in fact under NEPA causation and redressability requirements are relaxed." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 473, 485 (9th Cir. 2011). "This relaxed redressability standard governs procedural challenges to programmatic actions as well as to specific implementing actions." *WildEarth Guardians*, 795 F.3d at 1156.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 18

To establish causation, the injury must be "fairly traceable" to the challenged action of the defendants, and not the result of the independent action of some party not before the court. *Lujan*, 504 U.S. at 560–561. Plaintiff need not show that Defendants' conduct is "the very last step in the chain of causation." *City of Seattle v. Monsanto Co.*, 387 F. Supp. 3d 1141, 1154 (W.D. Wash. 2019) (quoting *Ass'n of Pub. Agency Customers v. Bonneville Power Admin.*, 733 F.3d 939, 953 (9th Cir. 2013)). However, plaintiff must show that there are no independent actions of third parties that break the casual link between the allegedly unlawful act and the alleged harm. *Monsanto Co.*, 387 F. Supp. 3d at 1154.

The relaxed redressability requirement for procedural claims is satisfied when "the relief requested–that the agency follow the correct procedures–may influence the agency's ultimate decision." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1227 (9th Cir. 2008). However, "the redressability requirement is not toothless in procedural injury cases." *Id.* "In cases where the alleged injury in fact is caused by a third party, a plaintiff must establish that the hoped-for substantive action on the part of the government could alter the third party's conduct in a way that redresses the injury in fact." *Ctr. for Biological Diversity v. Export-Import Bank*, 894 F.3d 1005, 1013 (9th Cir. 2018).

Here, Plaintiffs assert that their alleged injuries can be redressed by additional NEPA analysis because, following additional environmental review, the agency might choose to adopt wolf-livestock conflict mitigation measures that

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 19

would reduce such conflicts and thus reduce lethal removals by WDFW. ECF No. 29-15 at 11 ("In particular, my harms would be lessened if the Forest Service were required to take concrete measures to prevent conflicts between livestock grazing on public lands and wolves."); ECF No. 29-16 at 13 ("My injuries would be redressed if the Forest Service adopted adequate measures to protect wolves and other forest carnivores from livestock conflicts . . . . "). Such measures include excluding livestock grazing near active core wolf areas i.e., denning and rendezvous sites. ECF No. 44 at 13; *see* AR01981 ("Based on field reports of the 13 wolf depredations on livestock since July 8, three were within about a mile of the pack's activity centers (den or rendezvous sites) and ten ranged from 2 to 10 miles away from wolf activity centers); *see also* AR01221 ("WDFW considers wolf radio collar data very sensitive and has expressed concern about dissemination of such information.").

Whereas "[t]he USFWS is the lead management authority over wolves where they remain federally listed in the state," the WDFW "is the lead agency where wolves are federally delisted" and the "lead agency to respond" to reports of wolf depredations. FP015358, FP015435. The WDFW's management of gray wolves is guided by the Wolf Recovery Management Plan. *See* FP14359 (the Plan aims to "[m]anage wolf-livestock conflicts in a way that minimizes livestock losses, while at the same time not negatively impacting the recovery or long-term perpetuation of a sustainable wolf population."); *see also* FP015360 ("The plan

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 20

outlines a range of management options to address wolf-livestock conflicts. These include both proactive, non-lethal . . . and lethal management options."). Lethal control is used only as needed after the WDFW makes a case-specific evaluation. FP015435, FP01538.

The Court finds that Plaintiffs have failed to show that a favorable ruling will ameliorate the claimed injury where the lethal removal of gray wolves is the prerogative of the WDFW, a third party not before the Court. *See Ctr. for Biological Diversity*, 894 F.3d at 1012 ("Where an essential element of standing depends on the reaction of a third party to the requested government action or inaction, 'it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made.'") (quoting *Lujan*, 504 U.S. at 562).

In *Western Watersheds Project v. Grimm*, 921 F.3d 1141 (9th Cir. 2019), the Idaho Department of Fish and Game ("IDFG") assumed and maintained responsibility for managing gray wolves Idaho upon the gray wolf's delisting in 2011, similar to the WDFW in Washington State. However, in meeting its wolf management objectives, IDFG received substantial assistance from Wildlife Services, a component of the U.S. Department of Agriculture's Animal and Plant Health Inspection service ("APHIS"). *Id.* at 1145. In fact, Wildlife Services carried out nearly all lethal wolf management in Idaho since 2011. *Id.* at 1148.

The Ninth Circuit found Plaintiffs' injuries were redressable because Plaintiffs had shown that halting Wildlife Services' wolf-killing activities pending

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 21

additional NEPA analysis could protect their aesthetic and recreational interests in gray wolves in Idaho.  *Id.* at 1147.  In so holding, the Court noted that "additional NEPA analysis could change Wildlife Services' activities in the long term" because "Wildlife Services could decide, in its discretion, to kill fewer wolves or to use only non-lethal means of wolf management moving forward."  *Id.* at 1148.

In rejecting Wildlife Services' argument that, without Wildlife Services' assistance in lethally removing wolves, IDFG could still exercise its independent authority to meet its wolf management objectives, the Ninth Circuit pointed to its decision in *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1156 (9th Cir. 2015) (holding that where APHIS and Nevada Department of Wildlife shared responsibility for Nevada's predator management program, it was possible that, without APHIS, Nevada would spend less on predator management or would implement control methods that were less harmful to the plaintiff's interests than those used by APHIS).

However, neither *Western Watersheds Project v. Grimm* nor *WildEarth Guardians v. U.S. Department of Agriculture* are directly on point.  As noted by the Federal Defendants, these cases involve the direct involvement of APHIS in the lethal removal of predators.  ECF No. 50 at 8.  For example, in *Grimm*, it was a matter of speculation as to whether IDFG would implement an identical program without Wildlife Services, thus resulting in the same number of lethal wolf removals.  *See Grimm*, 921 F.3d at 1149.  Such speculation is absent here.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 22

More specifically, the Court need not speculate as to whether the state agency has the requisite expertise and resources to carry out lethal wolf management operations because WDFW is the lead agency.  DM03376 ("The WDFW is the primary agency responsible for managing wolves in the Eastern Washington recovery area while WDFW works as an agent of the USFWS in the remaining areas of the state."); *contra Grimm*, 921 F.3d at 1149.

Additionally, the Wolf Conservation and Management Plan provides that lethal removal is conditioned upon non-lethal measures being tried but failing to resolve the conflict.  *See* FP015438 ("Lethal removal may be used to stop repeated depredation if it is documented that livestock have clearly been killed by wolves, non-lethal methods have been tried but failed to resolve the conflict, depredations are likely to continue, and there is no evidence of intentional feeding or unnatural attraction of wolves by the livestock owner."); *see also* DM03391 ("The WDFW and livestock producers can implement non-lethal and preventative control measures any time they deem necessary throughout Washington."); *see also* AR03179 (moving cattle due to wolf presence).  Thus, at least some of the mitigation measures that Plaintiffs seek are already in place and reflected in current removal rates.

Accordingly, the Court finds that Plaintiffs have not shown that additional NEPA analysis could protect their aesthetic and recreational interests in gray wolves in the Colville National Forest.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 23

### C. Standing to Challenge 2019 Forest Plan Revision & Ripeness of NFMA Claims[1]

The Federal Defendants also contend that "Plaintiffs have not demonstrated standing to challenge the 2019 Forest Plan revision because the 2019 Plan does not contemplate wolf removal actions or authorize grazing, and the only project-level grazing authorization Plaintiffs challenge is the 2013 Permit, which is governed by the 1988 Forest Plan.  ECF No. 37 at 29.  Furthermore, the Federal Defendants assert that "Plaintiffs' facial challenges to the 2019 Forest Plan under NFMA are premature because they can identify no injuries caused by the forest plan or any site-specific injuries due to implementation of the forest plan."  *Id.* at 40.

*"Ohio Forestry* held that a generic challenge to a forest plan untethered to any specific or concrete harm was not ripe for adjudication, and therefore not justiciable."  *Wilderness Soc. v. Thomas*, 188 F.3d 1130, 1133 (9th Cir. 1999) (citing *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726 (1998)) (concluding that the plaintiff's challenge to a resource management plan adopted by the United States Forest Service was not ripe because the plan did not in itself authorize the

---

[1]  "In many cases constitutional ripeness coincides squarely with standing's injury in fact prong."  *Idaho Rivers United v. United States Army Corps of Engineers*, No. C14-1800JLR, 2016 WL 498911, at *10 (W.D. Wash. Feb. 9, 2016) (citation omitted).

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 24

agency to enter into logging agreements without a further review process); *see also ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1136 (9th Cir. 1998) (acknowledging that *Ohio Forestry* "calls into doubt a plaintiff's ability to challenge an agency's adoption of a plan without site-specific actions as the focus of the challenge.").

"[T]he ripeness doctrine would not bar a challenge to a forest plan if the plaintiff alleged a specific harm that would flow immediately from adoption of the plan." *Wilderness Soc.*, 188 F.3d at 1133 (citing *Ohio Forestry*, 523 U.S. at 736–38). Thus, for a challenge to a forest plan to be justiciable under the Act, the plaintiffs must allege either (1) imminent concrete injuries that would be caused by the forest plan or (2) a site-specific injury causally related to an alleged defect in the forest plan. *Id.* at 1133–1134 (holding that a generalized claim that the Forest Service violated NFMA by failing to conduct a forest-wide study on the suitability of grazing was not justiciable, but "because the site-specific injury to the two allotments is alleged to have been caused by a defect in the Forest Plan, we may consider whether the Forest Service complied with the Act in making its general grazing suitability determinations in the Forest Plan."); *see also Idaho Rivers United*, CASE NO. C14-1800JLR, 2016 WL 498911 at *7 (plaintiffs may not "mount a challenge to the [programmatic management plan] without demonstrating 'any concrete application that threatens imminent harm to [their] interests.'") (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009)).

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 25

Here, Plaintiffs have not demonstrated cognizable harm which has flowed immediately from the adoption of the revised 2019 Forest Plan.  The Forest Plan does not give anyone, including Diamond M, a legal right to graze livestock.  *See Ohio Forestry*, 523 U.S. at 729 ("Although the Plan sets logging goals, selects the areas of the forest that are suited to timber production . . . and determines which "probable methods of timber harvest are appropriate . . . it does not itself authorize the cutting of any trees."); *compare* ECF No. 1 at 53 ("The Forest Service violated NFMA's procedural[2] requirements by failing to consider during the Forest Plan

_____

[2] Plaintiffs characterize their NFMA claims under 36 C.F.R. § 219.26 and § 219.20 (1982) as "procedural claims" which can be brought as a facial challenge to the Forest Plan.  ECF No. 44 at 23.  However, the Federal Defendants argue and the Court agrees that Plaintiffs' NFMA claims "challenge the substance of the Forest Service's compliance with the grazing suitability and wildlife diversity and viability mandates."  ECF No. 50 at 14 n. 5; *see also Ohio Forestry*, 523 U.S. at 737 (distinguishing challenge to forest plan under NFMA from environmental impact statement prepared pursuant to NEPA; "NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result."); *see also Neighbors of Cuddy Mountain*, 303 F.3d at 1071 n. 6 ("[W]e emphasize that the Forest Service's compliance with NEPA's procedural requirements do not necessarily satisfy its different, more substantive duties under NFMA to ensure species viability

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 26

revision process . . . which portions of the Colville are suitable for grazing in light of repeated wolf-livestock conflicts or any measures for "regulating" conflicts between livestock and wolves. 36 C.F.R. § 219.20 (1982).") *with Wilderness Soc.*, 188 F.3d at 1133–34 (finding claim alleging "that the Forest Service violated the NFMA by adopting the Plan before conducting a grazing suitability determination" was not justiciable).

No grazing will take place under the 2019 Forest Plan until the Forest Service engages in project-level NEPA analysis.  *See Ohio Forestry*, 523 U.S. at 735 ("[T]he possibility that further consideration will actually occur before the Plan is implemented is not theoretical, but real."); *see also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) ("BLM's decision to exclude broad changes to its grazing management throughout the Monument in the Breaks Resource Plan does not avoid its critical obligation to consider changes to grazing preferences at the site-specific stage."); *see also* FP108235 ("[L]ivestock grazing is a suitable use of NFS lands and level of grazing is determined for each allotment

throughout the forest."); *Or. Nat. Des. Assoc. v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020) ("We recognize the Forest Service's substantive obligations to ensure that "[s]ite-specific projects and activities . . . be consistent with the approved forest plan[.]").

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 27

under project-level NEPA analysis.  Determinations about the type and amount of grazing, seasonal restrictions, and site-specific direction are determined during that project-level analysis.").

For a site-specific injury causally related to alleged defects in the forest plan, Plaintiffs point to "annual authorizations through which the USFS authorizes grazing on the Diamond M allotments, a site-specific action that should implement the revised Forest Plan."  ECF No. 44 at 11.  The Forest Service maintains that it does not issue AOIs, but rather, merely issues "Grazing Management Strategy Notes."  ECF No. 37 at 54; *see ONDA*, 465 F.3d at 983 (holding that AOI is an agency action under the APA where AOI was incorporated and "made part of Part 3 of [the] Term Grazing Permit" by reference in the AOI); *see also W. Watersheds Project v. Bureau of Land Mgmt.*, 971 F.Supp.2d 957, 977 (E.D. Cal. 2013) ("But because the permit had already been issued, the federal action was complete and there was no ongoing major federal action mandating NEPA review.").

Assuming *arguendo* that the Forest Service's "Grazing Management Strategy Notes" for the 2020 grazing season gives rise to site-specific injury, it is not causally related to alleged defects in the revised 2019 Forest Plan.  Rather, any such action would have been authorized under the 2013 Permit issued, which remains in effect until 2022, under the 1988 Forest Plan, which Plaintiffs have not challenged.  ECF No. 37 at 53; 36 C.F.R. § 219.15 ("Every decision document approving a plan, plan amendment, or plan revision must state whether

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 28

authorizations of occupancy and use made before the decision document may proceed unchanged."); *see* FP113667 ("Previously approved and ongoing projects and activities are not required to meet the direction of the revised land management plan and will remain consistent with the direction in the 1988 plan, as amended (USDA Forest Service 1986)."); FP113668 ("Authorizations for occupancy and use made before this plan approval may proceed unchanged until time of reauthorization.").

Thus, Plaintiffs have neither demonstrated that they will suffer imminent concrete injuries that would be caused by the 2019 Forest Plan nor a site-specific injury causally related to an alleged defect in the 2019 Forest Plan. Accordingly, Plaintiffs' NFMA claims challenging the 2019 Forest Plan are not justiciable. *See Ohio Forestry*, 523 U.S. at 734 ("Any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, i.e., the Plan plays a causal role with respect to the future, then-imminent, harm from logging.").

Having found that Plaintiffs do not have standing for their NEPA and NFMA claims, the Court does not reach the merits of those claims nor does it reach the merits of Plaintiffs' Motion to Consider Extra-Record Evidence, ECF Nos. 30, 34, filed in support of their supplemental NEPA claim.

## II.   ESA Claim—Failure to Consult with USFWS

Plaintiffs assert that "[t]he USFS violated Section 7(a)(2) of the ESA by failing to consult with USFWS over the potential effects of Diamond M's cattle grazing on the C.C. Mountain, Copper-Mires, and Lambert allotments to ESA-listed species."  ECF No. 29 at 53 (citing 16 U.S.C. § 1536(a)(2) ("Each Federal agency shall . . . insure that any action authorized, funded, or carried out by such agency . . .  is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical . . . ."); *see also* ECF No. 1 at 56 ("At least since 2000, the Forest Service has failed to prepare a Biological Assessment to determine whether annual grazing on the Copper-Mires, Lambert, and C.C. Mountain allotments "may affect" listed, proposed and/or candidate species such as Canada lynx, grizzly bear and whitebark pine that may be present in the action area.").

Section 7 of the ESA requires an agency to ensure that no discretionary action will "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 50 C.F.R. § 402.12(a); see 16 U.S.C. § 1536(a)(2).  The first step in complying with ESA-mandated inter-agency consultation procedures is to obtain from the appropriate federal wildlife service "a list of any listed or proposed species or designated or proposed critical habitat that may be present in

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 30

the action area." 16 U.S.C. § 1536(c)(1). If the wildlife service advises that a listed species may be present in the affected area, the agency must complete a biological assessment (BA) in accordance with NEPA "for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action." *Id.* If the biological assessment concludes that listed species are in fact likely to be adversely affected, the agency ordinarily must enter "formal consultation" with the wildlife service. 16 U.S.C. § 1536(a)(2); *see* DM02303 (Biological Evaluation for the Big Border Cluster Grazing Allotments, Grazing Permit Reissuance Analysis dated August 11, 2006).

There is no dispute that the Forest Service fulfilled its ESA Section 7 obligations on a "programmatic level" in its Biological Assessment and with its formal consultation with the USFWS on the 2019 Plan. ECF Nos. 44 at 29–30, 50 at 21. However, Plaintiffs contend that the Forest Service failed to consult over the site-specific impacts of Diamond M's grazing on the Lambert, Copper-Mires, and C.C. Mountain allotments on the whitebark pine, Canada lynx, and grizzly bear. The Court addresses each species in turn.

### 1. Whitebark Pine

The Federal Defendants argue that it had no Section 7 consultation requirement with respect to the whitebark pine because it was not listed as an ESA-protected species. ECF No. 37 at 57; ECF No. 1 at 26 (Plaintiffs' Complaint identifying the whitebark pink as a candidate for federal listing); *see* 50 C.F.R. §

402.12(d) (candidate species have no legal status and are accorded no protection under the Act).  Plaintiffs' response and reply is silent on this issue.  *See* ECF No. 44 at 35–36.

The Court concurs with the Federal Defendants that because the whitebark pine was neither listed nor proposed to be listed, but was rather a candidate species, the Forest Service had no duty to consult or confer under the ESA until December 2020.

## 2.  Canada Lynx

With respect to the lynx, the Federal Defendants assert that the Forest Service consulted with USFWS under ESA Section 7 in March 2000 and again in 2017 in connection with the BA and Biological Opinion for the 2019 Forest Plan. ECF No. 37 at 58; *see* FP005512–15 (BA for Colville National Forest, Forest-wide Existing and Ongoing Projects in Potential Lynx Habitat dated March 1, 2000, concluding that livestock grazing "may affect but is not likely to adversely affect" lynx or lynx habitat).  Plaintiffs argue that the programmatic BA is insufficient. ECF No. 44 at 36; *see also* FP098496 ("[A]ny future land management activities that occur through implementing the plan will be subject to ESA section 7(a)(2) consultation.").

Plaintiffs cite to *Native Ecosystems Council v. Marten*, No. CV 18-87-M-DLC, 2020 WL 1479059, at *9 (D. Mont. Mar. 26, 2020) for support.  ECF No. 44 at 36.  In *Marten*, the programmatic BA was a 12-page document for 11 national

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 32

forests across four states. *Marten*, No. CV 18-87-M-DLC, 2020 WL 1479059, at *9. The BA concluded that general forest treatment activities were not a threat to wolverine's survival but disclaimed that "some activities listed in the proposed action . . . have the potential to affect individual wolverines and/or their habitat, but not to the level of jeopardizing the continued existence of the wolverine." *Id.* The court concluded that "[t]he programmatic BA is insufficient to meet the Forest Service's obligation to address the 'direct and indirect effects of an action on the species together with the effects of other activities that are interrelated or interdependent with that action,' 50 C.F.R. § 402.02, because it is too general." *Id.*

As noted by the Federal Defendants, whereas the programmatic BA in *Marten* was exceedingly brief, comprised of only 12 pages, and broader in scope, encompassing 11 national forests across four states, the BA for the 2019 Forest Plan is a comprehensive 263-page document focusing on one national forest in one state. ECF No. 50 at 22; *see* FP098766–099033 (Biological Assessment); FP100804–100806 (USFWS Biological Opinion outlining actions implemented under the Forest Plan that may result in positive and negative effects to lynx habitat including livestock grazing). Given these factual differences with respect to the thoroughness and scope of analysis, the Court finds Plaintiffs' reliance on *Marten* is misplaced.

For the Canada lynx, USFWS determined that the revised 2019 Forest Plan was not likely to jeopardize the lynx's continued existence. *See* FP100807

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 33

(UWFWS concluding that the Forest Plan, encompassing the allotments, is not likely to jeopardize the continued existence of the lynx).

This determination was subsequent to informal consultation with USFWS in 2000 where the USFWS concluded that the ongoing projects and activities on the Forest, including livestock management and cattle grazing, "may affect, but are not likely to adversely affect" the lynx. FP005506–005509 ("This project should be re-analyzed if new information reveals that effects of the action may affect listed species or critical habitat in a manner, or to an extent, not considered in this consultation; if the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in this consultation; and/or if a new species is listed or critical habitat is designated that may be affected by this project.").

In light of these consultation efforts, the Court finds that the Forest Service appropriately consulted with UWFWS over grazing impacts to lynx on the allotments.

**3. Grizzly Bear**

The Federal Defendants argue that the Forest Service had no duty to consult with USFWS because grizzly bears have not been detected in that area for nearly two decades. ECF No. 37 at 59–60; *see also All. for the Wild Rockies v. Krueger*, 664 Fed. App'x 674, 676–678 (9th Cir. 2016) (holding that Forest Service's determination that the grizzly bear is not a species that "may be present" in the

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 34

project area given only unverified grizzly sightings was not arbitrary and capricious); *see also Native Ecosystems Council v. Krueger*, 946 F. Supp. 2d 1060, 1074 (D. Mont. 2013) ("The question of whether lynx 'may be present' in an area is less rigorous than the question of whether lynx 'occupy' an area.").

Plaintiffs assert that the Forest Service was required to confer over potential grizzly bear presence on the allotments given that "bears occupy the Forest's eastern half, have been documented within its western half, and the Kettle River Range provides high quality habitat complete with whitebark pine–a primary food source for grizzlies."  ECF No. 44 at 36.

The Court finds that the Forest Service had no obligation to consult with the USFWS over site-specific impacts of grazing to grizzlies because the Forest Service's determination was reasonable that the presence of grizzlies is limited to areas outside the allotments, based upon the Forest Service's historical record and scientific data.  *See Alliance for the Wild Rockies v. Bradford*, 864 F. Supp. 2d 1011, 1020 (D. Mont. 2012) ("There is significant evidence in the record to support the Forest Service's conclusion that grizzles are no longer present in the Project area–there had not been a credible grizzly sighting or evidence of grizzly habitation in the area since 1995 . . . ."); *see* AR01816 (2020 Forest Service map showing no grizzly observations from 2000 to 2019 on or near the allotments); FP095165 ("The LeClerk Creek Grazing Allotment is the only active grazing

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 35

allotment within the [Colville National Forest] portion of the Selkirk Grizzly Bear Recovery Zone.").

For the reasons stated above, the Court finds that the Forest Service consulted with the USFWS when appropriate and thus judgment should be entered in favor of the Federal Defendants for Plaintiffs' claim under the ESA.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiffs' Motions to Consider Extra-Record Evidence in Support of Plaintiffs' Motion for Summary Judgment, **ECF Nos. 30, 34**, are **DENIED AS MOOT**.

2.    Plaintiffs' Motion to Strike Federal Defendants' and Defendant Intervenors' Extra-Record Declarations and Exhibits, **ECF No. 46**, is **GRANTED**.

3.    Plaintiffs' Motion for Summary Judgment, **ECF No. 29**, is **DENIED**.

4.    The Federal Defendants' Cross-Motion for Summary Judgment, **ECF No. 37**, is **GRANTED**.  Plaintiffs' NEPA and NFMA claims are **DISMISSED WITHOUT PREJUDICE** and Plaintiffs' ESA claim is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order, enter judgment for the Federal Defendants, provide copies to counsel, and **close the case**.

**DATED** September 10, 2021.    _____*s/ Rosanna Malouf Peterson*_____
ROSANNA MALOUF PETERSON
United States District Judge

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ~ 36